IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

DANA DECEMBER SMITH,

      Petitioner,

v.                        Case No. 2:09-cv-00242

DAVID BALLARD, Warden,
Mount Olive Correctional Complex,

      Respondent.

### PROPOSED FINDINGS AND RECOMMENDATION

On March 18, 2009, Petitioner filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (docket sheet document # 1). This matter is assigned to the Honorable Joseph R. Goodwin, Chief United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

On April 28, 2009, pursuant to the undersigned's Order, Petitioner completed the form used by this court for the filing of a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (# 9) and a Memorandum in Support of the Petition (# 10).

On May 11, 2009, Respondent filed a Motion to Conduct Discovery (# 12) concerning an issue that suggested serious improprieties by Petitioner's former habeas counsel and investigator in connection with his state habeas corpus

proceedings.  Respondent sought leave to subpoena notes and correspondence from the Kanawha County Public Defender's Office, which also raised issues of attorney-client privilege and work product protection.  Accordingly, although the undersigned had twice denied Petitioner's motions for appointment of counsel, on May 13, 2009, the undersigned appointed Assistant Federal Public Defender Edward H. Weis to represent Petitioner in order to respond to the Motion for Discovery.  (# 13).

On November 2, 2009, after an *in camera* review of the documents sought, and briefing of the matter by the parties, the undersigned entered an Order denying without prejudice Respondent's Motion for Discovery (in fact, it was a second motion; the first motion was denied on July 28, 2009, when more extensive briefing was ordered on the discovery matter).  The November 2, 2009 Order further directed that, in the event that Petitioner sought to use any of the materials that had been produced *in camera* for any purpose in this action, then Respondent could file an immediate motion for relief (to have access to the documents as well).  (# 34).

On November 23, 2009, Respondent filed a Response to the Petition for a Writ of Habeas Corpus (# 38), a Motion for Summary Judgment (# 39), with supporting exhibits (## 39 and 40), and a Memorandum of Law in support thereof (# 41).  These documents were served on Mr. Weis, who was still representing Petitioner at that

time.

    On December 2, 2009, Mr. Weis filed a Motion to be Relieved of
Appointment and for Appointment of New Counsel for Petitioner (#
42).  In the motion, Mr. Weis indicated that the Office of the
Public Defender had discovered a conflict of interest, in that the
office had represented the mother of a person who testified at one
of Petitioner's pre-trial hearings, and who was a potential witness
at Petitioner's trial, but was not called to testify before the
jury.

    The undersigned's review of Petitioner's trial transcripts
reveals that there was a pre-trial hearing on December 14, 1992,
during which Petitioner's ex-girlfriend, Ivy Michelle Hamm,
testified about a threatening phone call she had received from
Petitioner, on September 7, 1991, which was placed from the Chelyan
Go-Mart approximately an hour and a half before Petitioner was
known to have been in the area of the crime scene.  Ms. Hamm
testified that Petitioner called her and said he was "on a
mission," that "he was going to kill [her]," and that "he couldn't
quit until his mission was over."  (# 40, Ex. 19 at 1610-1611).
Ms. Hamm further testified that, after Petitioner hung up, she
dialed "star 69" and called the number from which the phone call
had been placed.  Petitioner answered the phone and said, "I'm in
your area, I'm real near, you better watch, I'm coming after you."
(Id. at 1611).  Ms. Hamm said Petitioner also threatened to kill

her mother.  (Id. at 1612).

According to Mr. Weis's Motion to Withdraw as Counsel, Ms. Hamm's mother, Debra Lynn Hamm-Dingess, was represented on federal criminal charges by the Federal Public Defender's ("FPD") Office. (# 42 at 1).  Although the trial court found that Ivy Michelle Hamm's testimony would be admissible under Rule 404(b), the State did not call her to testify at trial, so the jury never heard this evidence.  Nevertheless, because the FPD's office represented Ms. Hamm's mother, whom Petitioner also allegedly threatened to kill, the undersigned found a clear conflict of interest that necessitated Mr. Weis's withdrawal as counsel.

Thus, on December 3, 2009, the undersigned granted Mr. Weis's Motion to be Relieved as Counsel, but denied the appointment of new counsel for Petitioner on the basis that the prior discovery issue had been resolved, and that Petitioner had demonstrated the ability to prosecute his habeas corpus matter pro se, unless and until an evidentiary hearing was ordered.  (# 43).  In the same Order, in accordance with the holding in Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975)  the undersigned advised Petitioner of his right and obligation to file a response to Respondent's Motion for Summary Judgment and set deadlines for a response and reply.  (Id.)

On December 15, 2009, Petitioner filed another Motion for Appointment of New Counsel (# 44).  On January 5, 2010, Petitioner filed a Motion to Conduct Discovery (# 47) and a Memorandum in

4

Support (# 48).  Petitioner's discovery motion indicated, <u>inter</u> <u>alia</u>, that Mr. Weis had collected some envelopes that were allegedly mailed by Tommy Lynn Sells, and would, accordingly, contain DNA from Mr. Sells' saliva.  Petitioner's discovery motion sought a subpoena for the aforementioned envelopes and letters in Mr. Weis's possession.   Petitioner further requested that DNA testing be done on the envelopes and letters for a comparison with new DNA testing that he requested be performed on evidence collected at the crime scene.

On January 7, 2010, Respondent filed a Response in Opposition to the Motion to Conduct Discovery (# 49).  Citing the Supreme Court's recent decision in <u>District Attorney's Office for the Third</u> <u>Judicial Circuit v. Osborne</u>, ___ U.S. ___, 129 S. Ct. 2308, 2320 (2009), Respondent argued that Petitioner has no federal constitutional right to DNA testing in this post-conviction proceeding, and that any additional DNA testing must be sought under the appropriate procedures established in the state court.

On January 11, 2010, Petitioner filed a Motion for Extension of Time to File a Response to Respondent's Motion for Summary Judgment (# 50).  On January 12, 2010, the undersigned entered an Order (# 51), denying Petitioner's Motion for Appointment of New Counsel (# 44) and Motion to Conduct Discovery (# 47).  However, the undersigned granted Petitioner additional time to file a Response to Respondent's Motion for Summary Judgment.  (# 51).

5

On February 2, 2010, Petitioner filed another Motion for Extension of Time to File a Response to Respondent's Motion for Summary Judgment (# 54) and a Motion for Leave to File a Traverse to Respondent's Reply (# 55).

On February 9, 2010, Petitioner filed a Second Motion to Conduct Discovery (# 56) and a Memorandum in support thereof (# 57).

On February 12, 2010, Petitioner filed a Response in Opposition to Respondent's Motion for Summary Judgment, in which Petitioner relies upon the arguments made in his 126 page petition, and the exhibits attached thereto. (# 58). Petitioner also filed a letter indicating that a Memorandum of Law in support of his Response and accompanying exhibits would be forthcoming. (# 59). The letter included a list of exhibits.[1] (Id.)

On March 5, 2010, Petitioner filed his Memorandum of Law in support of his Response in Opposition to Respondent's Motion for Summary Judgment. (# 60). The 44 page Memorandum responds in detail to the arguments made in Respondent's Motion for Summary Judgment and Memorandum of Law in support thereof.

On March 16, 2010, Petitioner filed another Motion for Leave to File Traverse to Respondent's Reply (# 61).

On April 2, 2010, Petitioner filed a Motion for Stay and/or Abeyance (# 64) and a Memorandum of Law in support thereof (# 65).

---

[1]  These exhibits were never provided by Petitioner.

On August 10, 2010, Petitioner filed motions requesting the undersigned's disqualification from consideration of this matter (## 67 and 68) and a Motion for Appointment of New Counsel (# 69). All of the pending motions have been addressed in separate Orders entered on the same date as this Proposed Findings and Recommendation.

### STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), which was adopted as part of the Anti-terrorism and Effective Death Penalty Act of 1996 (the "AEDPA") provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the Supreme Court held that under the "contrary to" clause, a federal court may grant a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) if the state court

7

decides a case differently from the Supreme Court on a set of materially indistinguishable facts. The Court further held that under the "unreasonable application" test, a federal court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court only if the state court identifies the correct governing principle from the Supreme Court's decision, but unreasonably applies that principle to the facts of the prisoner's case. Id. at 413.

Moreover, the AEDPA contains a presumption that a state court's factual findings are correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Rule 56 of the Federal Rules of Civil Procedure applies to habeas corpus proceedings. See, e.g., Blackledge v. Allison, 431 U.S. 63, 81 (1977); Maynard v. Dixon, 943 F.2d 407, 412 (4th Cir. 1991). Entry of summary judgment is appropriate when there is "'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Rule 56(c), Fed. R. Civ. P.).

## CIRCUIT COURT PROCEEDINGS AND FINDINGS

During the January 1992 term, Petitioner was indicted by a Kanawha County grand jury on two counts of first degree murder, two counts of aggravated robbery, and one count of first degree sexual assault (State v. Smith, Case No. 92-F-11) (# 39, Ex. 2). Following a jury trial, on December 30, 1992, Petitioner was convicted of two counts of first degree murder, without a recommendation of mercy. (Id., Ex. 2). The jury found Petitioner guilty on a felony murder theory based upon the aggravated robbery charges. (Id.) The jury made no finding on the sexual assault charge. (Id.)

By Order entered January 28, 1993, Petitioner was sentenced to two terms of life imprisonment in the state penitentiary without the possibility of parole. (Id.)

On April 5, 1994, Petitioner, by counsel, filed a Petition for Appeal of his conviction and sentence to the Supreme Court of Appeals of West Virginia (the "SCAWV"). (# 75). The Petition for Appeal was refused by the SCAWV on September 9, 2004. (Id.)

In February of 1995, Petitioner filed a Petition for a Writ of Habeas Corpus in the Circuit Court of Kanawha County. A second petition was filed on February 11, 1997 (No. 97-MISC-43). (# 39, Ex. 3). An amended petition was filed by retained counsel on June 19, 2003 (id., Ex. 4), and that petition was amended on July 28, 2003, pro se.

9

On January 20, 2004, the Circuit Court of Kanawha County appointed the Kanawha County Public Defender to represent Petitioner.

On March 25, 2005, court-appointed counsel filed a Supplemental Memorandum of Law in support of Petitioner's Amended Petition for a Writ of Habeas Corpus. (<u>Id.</u>, Ex. 11).

On January 17 and 18, 2006, an evidentiary hearing was conducted by the Circuit Court. (<u>Id.</u>, Ex. 12).  The testimony at the hearing will be discussed <u>infra</u>.

On September 17, 2007, the Circuit Court of Kanawha County entered an Order denying Petitioner's habeas corpus petition, in which the court made findings of fact and conclusions of law.  The undersigned believes that a recitation of the findings of fact and conclusions of law made by the Circuit Court are necessary to a ruling on Petitioner's federal habeas corpus petition. Accordingly, the Circuit Court's ruling is recited verbatim as follows:

<b><u>Findings of Fact</u></b>

8.  On Saturday, September 7, 1991, shortly before 5:00 p.m. the Petitioner lost control of a family friend's vehicle and was involved in a single vehicle roll-over crash near Ohley on Cabin Creek Road, Kanawha County, West Virginia.  Petitioner suffered minor cuts in the crash.  Trial Tr. 2228-33, 2243-47.

10

9.  The Petitioner was picked up hitchhiking and dropped off near the town of Leewood, at the forks of Cabin Creek Road.  Trial Tr. 2236-39.

10.  Approximately forty-eight (48) hours later, on Monday, September 9, 1991, the bodies of Margaret McClain and her daughter, Pamela Castaneda[2], were found murdered in their home at Leewood. Trial Tr. 1738-40.

11.  The victims' vehicle, a white Ford Taurus Station Wagon, and a rented VCR were missing from the victims' residence.  Trial Tr. 1812-13.

12.  On Tuesday, September 10, 1991, the victims' vehicle was located near Chapmanville, West Virginia, by the State Police. Trial Tr. 1816-17.

13.  While searching the victims' home a remote control to the missing VCR and the rental agreement were located.  Trial Tr. 1812, 1829.

14.  Petitioner was charged with leaving the scene of an accident on September 11, 1991, at which time blood and hair samples were collected.  Trial Tr. 1956-60.

15.  On Monday, September 16, 1991, the Petitioner was arrested and charged with the murders of Ms. McClain and Ms.

---

[2]  The undersigned notes that this victim's last name is spelled differently throughout the Circuit Court's Order and the entire state court record.  The undersigned believes this to be the proper spelling of the victim's last name, and that is the spelling that will be used herein.

11

Castaneda.

16. The Petitioner was indicted in the January 1992 term of court. The five-count indictment includes:

Count One: Murder of Pamela Castaneda.
Count Two: Aggravated robbery of the automobile, video cassette recorder, and stereo of Pamela Castaneda.
Count Three: First degree sexual assault of Pamela Castaneda.
Count Four: Murder of Margaret McClain.
Count Five: Aggravated robbery of unspecified property of Margaret McClain.

Indictment No. 92-F-11, Circuit Court of Kanawha County.

17. The Petitioner's trial was conducted between November 23 and December 30, 1992, with the following evidence presented:

18. Steve Pritt testified that he was a friend of the Petitioner. Mr. Pritt identified the Petitioner as visiting him at his father's home in Leewood, West Virginia, in the late afternoon of September 7, 1991. This was a quarter of a mile from the victims' residence. Mr. Pritt testified that the Petitioner was wearing camouflage pants and a military belt with a knife and a canteen. Trial Tr. 2346.

19. A canteen was recovered inside the victims' residence. Trial Tr. 1782.

20. Dora Back, a neighbor of the victims, testified by video that she last saw the victims alive at 5:00 p.m. on Saturday, September 7, 1991. At that time, she saw the victims' white Ford Taurus parked in front of their house. Trial Tr. 1348, 49 and 2299.

21.  Ms. Back further testified that when she returned home at 8:30 p.m. the victims' car was gone.  Trial Tr. 1351, 2299.  Ms. Back did not see or hear any activity at the victims' house except for the dog barking from inside the house when someone knocked on the door on Sunday, September 8, 1991.  Trial Tr. 1351, 1356, 2299.

22.  Two residents of Leewood, West Virginia, Cathy Bragg and Ernest Jarrell, who lived seven and five houses from the victims, respectively, testified that they saw a man walk past their homes on Saturday, September 7, 1991, wearing camouflage, with a knife and a canteen on his belt.  Trial Tr. 2304-06, 2321-22.  Neither witness had previously mentioned seeing a knife in their statements to the police.

23.  Rachel Britton, another neighbor of the victims, testified that the victims' car was gone at about 6:00 p.m., Saturday, September 7, 1991.  Trial Tr. 1358-59.

24.  Anita McKinney, a friend of Petitioner, testified that the Petitioner drove to her house in Boone County, West Virginia, between 6:45 and 7:00 p.m. on Saturday, September 7, 1991.  Trial Tr. 2252-54.  She testified that the car was light colored and muddy.  Trial Tr. 2255.  Ms. McKinney also testified that the Petitioner said that he was taking his VCR for repair.  Trial Tr. 2256.

25.  Ms. McKinney testified that Petitioner was wearing a camouflage shirt and jeans.  Trial Tr. 2256.  He also had cuts and

13

scrapes on his body.   Trial Tr. 2258-59.

26.   Ms. McKinney further testified that on Tuesday, September 10, 1991, the Petitioner called her and asked her to tell the police that he was at her house over the weekend and that he hitchhiked to her house, instead of driving a car.   Trial Tr. 2263-65.

27.   Jeanette Laws, another friend of the Petitioner, testified that between 7:30 and 8:00 p.m. on Saturday, September 7, 1991, the Petitioner drove to her house in Boone County, West Virginia in a white Ford Taurus Station Wagon with a handicap license plate, wearing a camouflage jacket and a "white teddy bear T-shirt."   Trial Tr. 2231-33.   He was bleeding from cuts and scratches.   Trial Tr. 2334.   She testified that the Petitioner left the t-shirt at her house.   The t-shirt was recovered by Detective Johnson of the Sheriff's Department.   Trial Tr. 2334-35.

28.   Another friend of the Petitioner, Denise Morgan, testified that the Petitioner drove to her house in Madison, Boone County, West Virginia, at approximately 11:30 a.m. on Sunday, September 8, 1991, in a white Ford Taurus Station Wagon.   She further testified that the Petitioner left a CB radio, a VCR and a walkman radio at her house.

29.   The daughter and sister of the victims, Paula Sydenstricker, testified that the victims' VCR had been disconnected from the television in the victims' residence and was

14

missing.   She testified that the walkman that was recovered from Denise Morgan's house belonged to her sister and was kept in the top drawer of her sister's dresser.   Trial Tr. 2501-02.

30.   An employee of the Rent-To-Own store in Kanawha City, West Virginia, Gene Moye, identified the VCR from Denise Morgan's house as being the same VCR that was rented to the victim, Pamela Castaneda, on August 31, 1991.   Trial Tr. 2495.

31.   Detective Johnson testified that he recovered the "Teddy Bear" t-shirt from Mrs. Law[s'] nephew at Mrs. Law[s'] house. Trial Tr. 1910.

32.   Patricia Lee, sister and daughter of the victims, testified that ten to fourteen days before their deaths, she had seen her sister wearing a white t-shirt, crafted by her sister, with a teddy bear applique on the front.   She identified the teddy bear t-shirt recovered from Jeanette Law[s'] house in court.   Trial Tr. 1707.

33.   Linda Harrison, a DNA analyst with the F.B.I. testified that she tested the bloodstains on the teddy bear t-shirt.   Trial Tr. 2184.   One of the bloodstains matched the Petitioner, with a random match probability of one in twenty-five persons.   Trial Tr. 2184.   Ms. Harrison further testified that another bloodstain on the teddy bear t-shirt matched the victim, Pamela Castaneda, with a random match probability of one in fifty-five thousand two hundred.   Trial Tr. 2181, 2186.

34.  Dr. Sopher, the State Medical Examiner, testified that based on the police investigation and his physical findings, there was nothing inconsistent with the victims being killed between the hours of 5:00 p.m. and 6:00 p.m. on Saturday, September 7, 1991. Trial Tr. 2570.  Dr. Sopher also testified that both victims had died from multiple stab wounds.  Trial Tr. 2560.

35.  Detective Johnson of the Kanawha County Sheriff's Department testified that gauze pads were located on the victims' kitchen table, one which had been opened and had a few drops of blood on it.  Trial Tr. 1775.

36.  Anita McKinney testified that when the defendant came to her house on Saturday, September 7, 1991, that he had cuts and scrapes.  She further testified that one of his wrists had gauze on it where someone had previously treated an injury.  Trial Tr. 2258, 59.

**Post-Conviction Habeas Corpus Proceedings**

37.  An evidentiary hearing was held on January 17 and 18, 2006, upon the Petitioner's Habeas Corpus petition.

38.  The Petitioner's main argument for the reversal of his conviction and the granting of a new trial is based on the video deposition of Tommy Lynn Sells.  Sells is currently a resident of death row in Texas, based upon his conviction for the murder of a child and the malicious wounding of her cousin, another child, in 1999.

16

## **The Confession of Tommy Lynn Sells**

39.  Sergeant John Allen of the Texas Rangers testified that Sells was arrested for the Texas murder on January 2, 2000. Following his arrest Sells began confessing to a series of homicides across the United States.  Sells sometimes took as many as four to five hours for investigators to get "one shred of evidence" to convince the agency investigating the case that Sells was involved.  Dep. Tr. 7-10.

40.  Sergeant Allen testified that on April 12, 2000, Sells began talking about a double homicide in Cabin Creek, West Virginia.  Sells began relating details of the homicide as follows:

> Sells stated that the double homicide occurred in Kanawha County, West Virginia in September of 1991.  Sells stated that the victims were a mother and daughter who possibly resided near the Boone County line adjacent to Kanawha County.   In addition, Sells recalled something called Cabin Creek or a sign that stated Cabin Creek.   Sells recalled meeting the daughter named Pamela at the Route 60 Lounge and eventually ended up at her residence. According to Sells, Pamela resided with her elderly mother who Sells recalled as being in bad health.  Sells was able to state the victims owned a white Ford Taurus automobile.  Sells continued by stating he stayed at the daughter's  residence  in  an  upstairs  attic  for approximately two or three days prior to the murders. Sells stated that Pamela's mother had no knowledge he was present due to her poor health and inability to go upstairs to the attic area.  Sells stated that the murders  were  prompted  when  he  took  the  mother's television set and traded it to a local subject for narcotics.   Sells further stated that when Pamela's mother became aware of this she became angry and extremely agitated.  Pamela and her mother were arguing and this is when he (Sells) decided to commit the murders.  Sells claims he stabbed each of the victims repeatedly with a knife in the downstairs of the residence.  Following the murders, Sells removed the

17

victims' pants in order for the attack to appear to be sexually motivated.  Sells said he left the victims' car and hitchhiked out of the area.  Allen Dep. Ex. No. 1, pp. 2-3.

41.  Sgt. Allen further testified that the exchange of information from Sells had never been this free-flowing during any of his "confessions" either before or after the statement concerning this particular homicide.  Dep. Tr. 21-22.

42.  Sgt. Allen further testified that when Sells was confronted with the fact someone else had been convicted of these murders, his response was "I didn't tell you that I did that.  I said I had a dream about that last night."  Dep. Tr. 23.

43.  On September 29, 2004, Sells testified by deposition from death row in Texas.  He testified that he spent time locked up with the Petitioner at the county jail "after his trial, he was, it was like major - yes."  Sells also testified that he assumed he was locked up at Mt. Olive with Smith, though he denied ever talking to him.  Dep. Tr. 30-31.

44.  Sells testified that he spent three days in the attic of the victims' house, without the knowledge of the elderly victim.  He described the attic as apartment-like with a bathroom.  Dep. Tr. 18-19.

45.  Sells testified that after killing the victims he cleaned up the crime scene, carefully leaving nothing behind to identify him.  Dep. Tr. 46-47.

18

46.    Sells testified that he took a C.B. radio from the victims' house and carried it away in a tote bag.  Dep. Tr. 56-57.

47.    Sells testified that the victims' house was just an ordinary house but he was able to describe an afghan that he remembered was black and that he had told Jane (the public defender's investigator) "that's the reason I noticed that."  Dep. Tr. 27.

48.  Sells testified that the victims' "small" or "medium" dog did not try to bite him during the murders because he got along with pets and that he could kill people but would not harm an animal.  Dep. Tr. 64-65.

### Implausibility of Tommy Lynn Sells' Confession

49.  Sells' version of how he stayed at the victims' house for two or three days before the murders took place is in direct contradiction to the evidence in the case.  There was no upstairs bedroom and bathroom in the victims' house where Sells could have stayed unnoticed until the "morning of the murders."  Thomas Lee, the son-in-law and brother-in-law of the victims, testified that the attic space in the house was used for storage and that it contained an old mattress that had been leaned up against the wall. He testified that the room was dark and dust covered and had not been disturbed and further, it had not been used as a bedroom and there was no bathroom.  Habeas Tr. 197-199.

19

50.   The evidence log maintained by the clerk at the trial of this matter lists State's Exhibit Number 18 as being a "photograph of an upstairs bedroom and bathroom."  As counsel for petitioner had the clerk produce the photo at the habeas proceeding, in order to cross-examine Thomas Lee, it was discovered by counsel that the photograph number 18 was of the downstairs bedroom and bathroom, and that the clerk's evidence log was erroneous, as was Mr. Sells' claim.  Habeas Tr. 212.

51.   Sells referred to a black afghan on a couch in the victims' residence to prove that he had actually been inside the victims' home.  There is a photograph of a black afghan introduced into evidence in the trial and contained in the evidence maintained in the Circuit Clerk's Office.  Defendant's Exhibit Number 10.  A review of the photograph in the Clerk's Office revealed that the afghan was in fact photographed at another residence in the case and not the victims'.  Habeas Tr. 36; Trial Evidence Log p. 8.

52.   Sells' claim that he stole the C.B. radio from the victims' residence did not occur.  The victims' C.B. radio was recovered from Denise Morgan's residence by Detective Ray Flint, after it was learned that the Petitioner had driven the victims' station wagon to the home of Ms. Morgan, where Petitioner left the victims' VCR and C.B. radio.  Habeas Tr. 216; Trial Tr. 2451-55.

53.   Sells' testimony that he carefully cleaned the crime scene and left nothing behind to identify him is clearly

20

contradicted by the scene itself. An empty gauze wrapper, blood stained gauze and a canteen lying in the living room floor are all pieces of physical evidence that indicate that Sells was never in the residence. Trial Tr. 1775-82.

54. Sells' testimony that he was not bitten by the victims' dog because of his ability to get along with pets and that he would not harm an animal is further proof that Sells was never in the victims' residence. He never mentioned a dog in any of his "five" confessions. He was not aware that the victims' pug was locked in a cage in the living room of the victims' house and the small Chihuahua had been killed and stuffed in the laundry room. Habeas Tr. 202; Trial Tr. 1738-1740.

55. Sells spent significant time locked up in the Kanawha County Jail with the Petitioner. Habeas Tr. 131. In addition they were both residents of the West Virginia Penitentiary at Mt. Olive. Yet Sells said that he and Petitioner did not know each other. Dep. Tr. 31.

56. Sells recalls specifics including the make and model of the victims' car, the size and shape of the knife, what he was wearing, how he got to the house and how he left, but he has no recall of where he was living at the time the crime was committed, where he went after the crime was committed or how long he stayed out of West Virginia after the crime. Dep. Tr. 47-54.

57.  The neighbors of the victims last saw them alive between 5:00-6:00 p.m. on Saturday, September 7, 1991.  Trial Tr. 1351, 1356, 2299, 1358-59.  They also saw the victims' car at the house during that time period but it was gone by 8:30 p.m. on that date. Trial Tr. 1351, 2299.

58.  It is uncontested that the Petitioner drove the victims' car to Anita McKinney's house in Boone County, West Virginia between 6:45-7:00 p.m. on Saturday, September 7, 1991.  Trial Tr. 2252-54.

59.  Sells' description of the crime occurring on the last morning he was in the victims' house does not comport with testimony introduced at trial and is inconsistent and contradicted by the uncontroverted facts of the case.  Dep. Tr. 59.

**Petitioner's Remaining Arguments for a New Trial**

60.  The testimony of Janet Smith Elswick that she saw the victims in their car, based on photographs in the newspaper concerning the murders, on a Sunday or Monday after the victims were "supposedly dead" is also completely inconsistent with the uncontroverted fact that the Petitioner had the victims' car in Boone County on Saturday, September 7, 1991.  Petitioner's witness, Jeanette Laws Kirk, confirmed that the Petitioner had the victims' car prior to the time that Mrs. Elswick claims to have seen the victims in the car.  Mrs. Laws further contradicted Mrs. Elswick's claim that she was told by Laws that the Petitioner had told her he

22

found the victims dead and took their car. Habeas Tr. 44-53;
Habeas Tr. 58-61.

61. Frederick William Whitehurst's testimony that there were
quality control problems in the F.B.I. Laboratory was not based on
the first hand knowledge or expertise in the area of D.N.A.
analysis. He gave no testimony that the D.N.A. testing in this
case was improper or that the results reached were wrong. Habeas
Tr. 87-92.

62. Dr. David Spitz gave no testimony other than matters
which were addressed by Dr. Sopher in his trial testimony. This
evidence was available at the time of Petitioner's trial or it
could have been discovered by due diligence. Dr. Spitz admitted on
cross-examination that the physical changes to the victims' bodies
did not show that Dr. Sopher was incorrect in his evaluation of the
time of death. Habeas Tr. 125-126. Dr. Spitz was in disagreement
about the determination of the life cycle of various spermatozoa,
but he testified that this was a reasonable difference in opinions.
Habeas Tr. 126.

**The Respondent's Habeas Testimony**

63. Former Corrections Officer Pringle testified that the
Petitioner and Tommy Lynn Sells were incarcerated together in the
lockdown section of the Kanawha County Jail. Habeas Tr. 131. He
testified that they were incarcerated together at the time Officer
Pringle began working at the jail in May of 1992. This time frame

23

would have included the period prior to the Petitioner's trial which began in December of 1992.  Sells testified that he remained incarcerated with the Petitioner following his trial and that he had knowledge that it was "major."  Dep. Tr. 30-31.

64.  Diana Fanning testified that she had authored a biography of Tommy Lynn Sells.  She testified that she had numerous interviews with Sells while he was in jail in Texas.  Habeas Tr. 138.

65.  Ms. Fanning testified that she interviewed Tommy Lynn Sells on November 6, 2001 about the double homicide in West Virginia.  She testified that Sells denied doing the murders and said the right person was behind bars, "Damien Smith."  Sells stated that he was in jail with the Petitioner, though they did not share a cell.  Sells also told Ms. Fanning that Petitioner had gotten someone else to write him letters about the crimes.  Habeas Tr. 140-141.  Ms. Fanning testified that when contacted by defense counsel in 2004 she again inquired of Sells concerning the Cabin Creek murders and that Sells was willing to talk to the defense for Petitioner.  Habeas Tr. 167.

## Conclusions of Law

66.  The standard for granting a new trial upon a showing of newly discovered evidence is set forth in In Re: Renewed Investigation of the State Police Crime Laboratory, Serology Division, 633 S.E.2d 762 (2006), and State v. Stewart, 161 W. Va.

24

127, 239 S.E.2d 777 (1977).

1.   The evidence must appear to have been discovered since the trial;

2.   It must appear from the facts in the defendant's affidavit that petitioner was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict;

3.   Such evidence must be new and material, and not merely cumulative; and cumulative evidence is additional evidence of the same kind to the same point;

4.   The evidence must be as such to produce an opposite result at a second trial on the merits; and

5.   A [] new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side.

67.   The evidence adduced at the habeas hearing of Mr. Whitehurst and Dr. Spitz do[es] not qualify as newly discovered evidence.  At most, their testimony would be an attempt to impeach Linda Harrison, the F.B.I. Laboratory D.N.A. expert and Dr. Sopher, the State Medical Examiner.  The Court is further of the opinion that their testimony, as presented, would not discredit the testimony at trial of either witness.

68.   The testimony of Janet Smith Elswick that she saw the victims and their car after Saturday, September 7, 1991 is inconsistent with the overwhelming evidence that the Petitioner had possession of the victims' car on Saturday, September 7, 1991.

69.   Ms. Elswick's testimony in this Court's opinion would not produce an opposite result at a second trial on the merits, based

25

on its inconsistency as well as her lack of credibility in light of her impeachment by the testimony of Jeanette Laws.

70.   The Court is of the opinion that the only evidence presented by the Petitioner which qualifies as "newly discovered evidence" is the "confession" of Tommy Lynn Sells.

71.   "A confession by another person does not invariably require a new trial; the integrity of the confession is for the trial court." State v. King, 313 S.E.2d 440 (1984).

72.   Tommy Lynn Sells' "confession," standing alone, pales when  the overwhelming and largely uncontested evidence that the Petitioner was near the victims' house shortly before the murders, having wrecked the automobile that he was driving; that he was in possession of the victims' automobile within less that two (2) hours of neighbors seeing the victims alive for the last time; that he was in possession of items belonging to the victims and normally kept in the victims' residence; that a t-shirt belonging to one of the victims, containing D.N.A. consistent with the petitioner and the victim, was left at the residence of a witness by the Petitioner; and that the Petitioner instructed a witness to lie to the police about where he was and how he got to the witnesses [sic; witness's] home to establish an alibi.

73.   Tommy Lynn Sells was incarcerated with the Petitioner during the Petitioner's highly publicized trial;

74.   Tommy Lynn Sells was incarcerated in the West Virginia Penitentiary with the Petitioner after the trial;

75.   Tommy Lynn Sells has recanted his "confession" on more than one occasion;

76.   Tommy Lynn Sells' testimony concerning spending three days in the victims' home, unknown to the elderly victim, while sleeping and eating and using the apartment-like upstairs bedroom and bathroom, are complete fabrications based on the evidence that there was no upstairs bedroom and bathroom, but only a dark dusty attic that was used for storage and was open to view from the downstairs of the victims' home.

77.   It is apparent to the Court that by some means, Mr. Sells obtained the information concerning the upstairs bathroom and bedroom from the clerk's description on the evidence log of State's Exhibit Number 18.   The description was entered incorrectly, as pointed out by both the Petitioner and the Respondent.   There was no upstairs bathroom.   State's Exhibit Number 18 clearly shows a downstairs bathroom.

78.   It is further apparent to the Court that by some means, Mr. Sells obtained the information concerning a photograph of a black afghan on a couch.   This specific fact appears to confirm his claim to have actually been at the crime scene; however, the couch and black afghan, as noted on the Trial Evidence Log, P. 8, were photographed in a residence that did not belong to the victims.

79.  These two (2) "mistakes" by Sells affect the integrity of his entire confession.

80.  Based on the implausibility of Tommy Lynn Sells' confession, as well as the lack of integrity of the confession, this Court does not believe there is evidence any [sic; any evidence] that would produce an opposite result at a second trial on the merits.

(# 39, Ex. 15).

### SCAWV OPINION AFFIRMING CIRCUIT COURT'S DECISION

On March 12, 2009, following extensive briefing and oral argument, the SCAWV issued its opinion in Petitioner's habeas appeal proceeding.  See State ex rel. Smith v. McBride, 681 S.E.2d 81 (W. Va. 2009).  The SCAWV's opinion made some factual findings that gave more detail than some of the findings addressed by the Circuit Court.  Those findings include:

> On Saturday, September 7, 1991, at around 4:30 p.m., Mr. Smith drove to the home of Steve Pritt in a four-door Dodge Aries. [FN 6] Mr. Pritt lived in the town of Leewood, West Virginia.  Mr. Pritt testified that Mr. Smith was wearing camouflage pants, military boots, and a baseball hat.  Mr. Smith was also wearing a green military belt that had a plastic canteen attached to it, [FN 7], along with a leather sheath that contained a knife.  Mr. Pritt spoke with Mr. Smith for about a half hour.  During that conversation Mr. Smith asked Mr. Pritt if he had seen Robert McClain, the son of Margaret McClain.  Mr. Pritt informed Mr. Smith that Robert had gone to Kentucky.
>
> [FN 6 - Mr. Smith was driving a car that was owned by Mary Walls.  Mr. Smith had been temporarily living with Ms. Walls and her son, Sam Walls, in West Logan, West Virginia.]

28

[FN 7 - Mr. Pritt was able to identify the canteen as being plastic because Mr. Smith took the canteen out of its cover.]

* * *

At about 6:45 p.m., on September 7th, Mr. Smith drove to the home of a friend, Anita McKinney. Ms. McKinney testified that Mr. Smith was driving a muddy, light-colored car. According to Ms. McKinney, Mr. Smith did not get out of the car, and they talked for a few minutes before he left.

Between 7:30 p.m. and 8:00 p.m., on September 7th, Mr. Smith drove to the home of another friend, Jeanette Laws. Ms. Laws testified that Mr. Smith drove to her house in a white Ford Taurus station wagon. Mr. Smith told Ms. Laws that the car belonged to his stepfather. According to Ms. Laws, Mr. Smith was wearing a T-shirt with a teddy bear emblem on it. Ms. Laws stated that, after Mr. Smith entered her home, he took off the teddy bear T-shirt and dropped it on the floor. [FN 13] According to Ms. Laws, the teddy bear T-shirt had blood on it. Ms. Laws testified further that Mr. Smith appeared nervous and could not sit still. Mr. Smith left Ms. Laws home after about twenty minutes. * * *

[FN 13 - Ms. Laws stated that Mr. Smith had cuts on his body. Mr. Smith informed Ms. Laws that the cuts were inflicted during a fight he had with friends of his ex-girlfriend. Ms. Laws treated some of the wounds with ointment and band-aids.]

After Mr. Smith left the home of Ms. Laws, he went back to the home of Ms. McKinney. Ms. McKinney testified that Mr. Smith entered her home on his second visit. While at the home, Ms. McKinney also treated the cuts that were on Mr. Smith's body. Ms. McKinney stated that Mr. Smith informed her that he had received the cuts after he fell into a briar patch. Mr. Smith also told Ms. McKinney that the car he was driving belonged to his mother. Ms. McKinney testified that she allowed Mr. Smith to spend the night at her home. Mr. Smith left the home at about 10:00 a.m. on Sunday, September 8th. Ms. McKinney testified further that Mr. Smith returned to her house later in the evening of September 8th. During that visit, Mr. Smith gave Ms. McKinney's daughter a Pizza Hut noid doll [which was later determined to be missing from

29

the victims' car].

681 S.E.2d at 83-85.

The SCAWV opinion further indicates that Denise Morgan testified that Petitioner had told her that he had stolen the car he was driving (the white Ford Taurus) because someone had stolen the car he had taken from Mary Walls.  Ms. Morgan further testified that Petitioner said he was going to ditch the car on the outskirts of Logan.  Id. at 85.  The SCAWV opinion further notes that, a day or two after Petitioner left her house, Ms. Morgan saw a news report with a picture of the victims' car, which looked like the one Petitioner had been driving, so she called her father, who was a deputy sheriff, and told him about the items Petitioner had left at her house.  Id. at 85 n.17.  The opinion further notes that the victims' car was found abandoned in Logan County, and that it did not appear to have been "hot-wired."  The victims' daughter/sister, Paula Sydenstricker, testified that the keys to the victims' car "were always hung on a nail that was in the kitchen door of the victims' home."  Id. n.18.

The SCAWV's opinion also discussed some facts concerning Petitioner's return to the Walls' home, where he had been living. These facts were not addressed by the Circuit Court.  The opinion states:

> At around noon on September 8th, Mr. Smith returned to the Walls' home, where he had been temporarily living for several months.  Sam Walls testified that Mr. Smith was not driving when he returned.  Mr. Walls indicated that

30

Mr. Smith stated that he had returned the car of Mr.
Walls' mother, Mary Walls, but that someone must have
stolen it from the driveway.  Mr. Walls testified that,
on September 9th, Ms. Walls asked Mr. Smith to cut a
roast.  Mr. Smith suggested that Mr. Walls use a hunting
knife that Mr. Walls used for cutting deer.  Mr. Walls
retrieved the hunting knife and observed that it did not
have the deer hairs that he had previously left on it.
[FN 19]  Mr. Walls testified that the hunting knife "had
something that looked like blood and sand on it." [FN 20]
There was also testimony by Mr. Walls that he owned an
aluminum canteen, and that he once owned a plastic
canteen, but that he lost it in some woods.  Dr. Sopher
testified that the stab wounds inflicted on the victims
were consistent with Mr. Walls' hunting knife.  Detective
Johnson testified that during his investigation, he
discovered a canteen and cover on the floor of the
victims' home.  Ms. Lee and Mr. McClain testified that
neither Ms. McClain nor Ms. Castaneda owned a canteen.

[FN 19 - There was also testimony from Mr. Walls that the
sheath for the knife had a tear on it that was not
present when he last used it.  In addition, Mr. Walls
indicated that his camouflaged webbed belt had been found
hidden in a box at this home and that a bloodstain was on
it.]

[FN 20 - Mr. Walls testified that, during the week of
September 7th, Mr. Smith had asked if he could wear the
hunting knife, but that he had told Mr. Smith not to
bother the knife.]

Id. at 86.

Another significant portion of the SCAWV's opinion concerned
the issue of Mr. Sells' alleged recantation of his confession.  The
SCAWV addressed the issue of whether the circuit court had
improperly considered the recantation letter, but only on the basis
of whether the letter could be authenticated.  The SCAWV's opinion
states in pertinent part:

Under the facts of this case, we do not believe the
circuit court abused its discretion, if in fact it

31

considered Mr. Sells' letter.

A hearing pertaining to Mr. Sells' letter was held on February 17, 2006. At the hearing, the State informed the trial court that, on February 6th, Deputy Poore telephoned the State with information that Mr. Sells had recanted his confession. The State asked Deputy Poore to have the recantation placed in writing. Upon receipt of Mr. Sells' recantation letter, the State provided Mr. Smith and the court with a copy of the letter. The State asked the trial court to consider the letter as evidence. Counsel for Mr. Smith provided a lengthy objection that essentially attacked the veracity of the substance of the letter. Mr. Smith personally interjected an objection to the letter on the grounds of authenticity. Defense counsel thereafter reiterated the objection on the grounds of authenticity. The trial court ruled that it would take the matter under advisement. The State thereafter informed the trial court that "if the Court rules, if you will not consider this statement, after a chance to review everything, we would ask leave of court to be able to take a deposition for [sic] Mr. Sells[.] Mr. Smith objected to having Mr. Sells deposed again. The trial court indicated that it would take all the issues under advisement and render a ruling "within the next two weeks or so[.]" The trial court entered an order on April 10, 2006, granting the State's motion to depose Mr. Sells. The State's brief indicates that the deposition never took place because Mr. Sells refused to cooperate with the State.

In view of the record submitted in this case, we are unable to definitively conclude that the trial court considered Mr. Sells' letter. Insofar as the State informed the trial court that it wanted to depose Mr. Sells only if the court refused to consider the letter, we must presume that the court did not consider the letter because it authorized the State to depose Mr. Sells. Mr. Smith points out that the trial court's order denying habeas relief referred to recantations by Mr. Sells. The only reference to Mr. Sells' recantations contained in the trial court's detailed and lengthy order is the following: "Tommy Lynn Sells has recanted his 'confession' on more than one occasion." We cannot attribute this passage as conclusively showing that the trial court considered Mr. Sells' recantation letter, because there was evidence by Sergeant Allen and Ms. Fanning that indicated Mr. Sells denied committing the

murders.  In addition, during the February 17th hearing, there was a statement made to the trial court that Mr. Sells recanted his confession in a newspaper called Del Rio Herald.

Id. at 89-90.  The SCAWV found, solely on the basis of state law, that, assuming that the trial court considered the recantation letter, the court did not abuse its discretion in doing so.  Id. at 90.

Turning to the issue of the credibility of Mr. Sells' confession, and whether Petitioner was entitled to a new trial, the SCAWV's opinion states:

Here, Mr. Smith argues that Mr. Sells' confession would bring about a different result at a new trial because the details that Mr. Sells knew about the victims and the crime scene are credible.  Mr. Smith listed the following as details from Mr. Sells' confession:  (1) Sells committed a double homicide (2) in Kanawha County, West Virginia (3) in September 1991, (4) the victims were a mother and daughter, (5) the victims resided on Cabin Creek near the Boone County line, (6) the daughter's name was Pamela, (7) Sells met Pamela at the Route 60 Lounge, (8) the elderly mother was in poor health, (9) the victims owned a white Ford Taurus automobile, (10) Sells stayed in the victims' upstairs attic for two or three days prior to the murders, (11) Sells traded the victims' television set for narcotics, [FN 41] (12) during an argument over the sale of the television, Sells repeatedly stabbed the victims, (13) the stabbing was committed in the downstairs area of the residence, (14) Sells removed the victims' pants to make the attack look sexually motivated, and (15) Sells left the victims' automobile behind and hitchhiked out of the area. [FN 42]

[FN 41 - In this appeal, Mr. Smith takes the position that Mr. Sells stole a television set from the victims and sold it for drugs.  This version of events was given by Mr. Sells to Texas law enforcement officials.  However, during his deposition, Mr. Sells stated that Ms. Castaneda sold the television and used the money to pay him for drugs he had given to her.]

33

[FN 42 - During the habeas corpus hearing, Mr. Smith introduced several witnesses who attacked the credibility of Ms. Harrison's DNA testimony and Dr. Sopher's determination of the time of death of the victims.  The circuit court found, and we agree, that the testimony of the witnesses did not constitute newly discovered evidence, nor could the evidence form the basis for a new trial. [Citations omitted].]

* * *

This Court agrees with the trial court, and the State, that Mr. Sells' confession lacked credibility. See United States v. Steel, 458 F.2d 1164, 1166 (10th Cir. 1972)("A hearing was held by the trial judge; he found Culp's confession lacking in credibility. We find no abuse of discretion on denial of appellant's motion for a new trial."); Love v. State 709 P.2d 1343, 1344 (Alaska Ct. App. 1990)(affirming trial court ruling that confessor "was probably the most non-believable witness I've ever seen in a court").  Mr. Sells confession clearly shows that he provided blatant "incorrect" information about the crime scene.  The fact that two of Mr. Sells' incorrect statements can be traced to improperly identified trial exhibits indicates that it is very plausible that someone supplied Mr. Sells with information about the murders.  The logical conclusion to be reached from all of the inaccuracies in Mr. Sells' confession in that his numerous recantations were in fact true, *i.e.*, he did not murder Ms. McClain and Ms. Castaneda.

Id. at 92-93.  The SCAWV then addressed Petitioner's claim of actual innocence in a footnote, as follows:

FN 44.  In his brief, Mr. Smith invokes the "actual innocence" doctrine to argue that to deny him a new trial would violate the State and federal constitutions.  This argument has no merit.  In federal jurisprudence, the phrase "actual innocence" was developed as a term of art. * * * The actual innocence doctrine was developed for the purpose of permitting federal courts to review claims by a defendant that were procedurally barred * * * In the instant case, Mr. Smith was not procedurally barred from bringing his newly discovered evidence claim; therefore, the "actual innocence" doctrine has no application. Further, assuming that the actual innocence doctrine was

applicable, the evidence presented at the habeas
proceeding did not establish, nor reasonably suggest,
that Mr. Smith is innocent. [Citation omitted].

Id. at 93 n.44.  The SCAWV further found:

The evidence introduced against Mr. Smith during his
trial established beyond a reasonable doubt that he
killed the victims.  The evidence included an admission
by Mr. Smith that he stole the victims' car.  The State
introduced evidence to establish that the car was started
with a key and was not hot-wired.  There was also
testimony that the victims kept keys to the car inside on
a nail that was in the kitchen door.  Evidence was
introduced to establish that Mr. Smith stole a VCR, CB
radio and a Walkman radio headset that belonged to the
victims.  There was testimony to show that the VCR and
Walkman radio headset were kept inside the home.  In
addition, the evidence showed that Mr. Smith was wearing
a T-shirt that belonged to Ms. Castaneda.  Based upon DNA
testing, it was established that blood on the T-shirt
matched Ms. Castaneda's DNA profile. [Footnote omitted]

* * *

The only legally relevant question for this Court is
whether or not the trial court had a basis for concluding
that because of "the implausibility of Tommy Lynn Sell's
confession, as well as the lack of integrity of the
confession, . . . there is [no] evidence . . . that would
produce an opposite result at a second trial on the
merits."  We find no abuse of discretion in the trial
court's ruling.

Id. at 95-96.

**PETITIONER'S GROUNDS FOR RELIEF**

Petitioner raises 10 grounds for relief in his section 2254

petition.  Those grounds are as follows:

1.  The State of West Virginia erroneously denied
    habeas corpus relief to the Petitioner because the
    newly discovered confession of Tommy Lynn Sells
    meets all criteria for granting a new trial based
    upon newly-discovered evidence and the Petitioner's
    claim of actual innocence pursuant to Schlup v.

<u>Delo</u>, 513 U.S. 298 (1995).

2.    The State of West Virginia erroneously considered a purported recantation by Tommy Lynn Sells, despite the recantation being un-authenticated, unsworn, and not subject to cross-examination, in violation of the Rules of Evidence and the State and Federal Courts precedents regarding confrontation of witnesses and purported recantations.

3.    The State of West Virginia erroneously denied habeas corpus relief to the Petitioner because the newly discovered evidence of the falsification of the DNA evidence by the FBI crime lab requires the reversal of the Petitioner's convictions.

4.    The State of West Virginia erroneously denied habeas corpus relief to the Petitioner because of the failure of the state to preserve the DNA material taken from the Teddy Bear T-shirt constitutes a denial of the Petitioner's right to a fair trial.

5.    The State of West Virginia erroneously denied habeas corpus relief to the Petitioner because the State prosecution suppressed evidence favorable to the Petitioner and failed to disclose exculpatory evidence in violation of the Petitioner's due process rights as guaranteed by the United States Constitution, and the Fifth and Fourteenth Amendments thereto.

6.    The State of West Virginia erroneously denied habeas corpus relief to the Petitioner because the trial court violated Petitioner's due process rights under the Fourteenth Amendment of the United States Constitution, and irreparably prejudiced the Petitioner's Motion to Suppress DNA based statistical probability projections that were based on novel calculation method not generally accepted by the scientific community.

7.    The State of West Virginia erroneously denied habeas corpus relief to the Petitioner because the trial court violated the Petitioner's constitutionally protected right to be free of unreasonable searches and seizures when the trial court denied the Petitioner's motion to suppress

all evidence of comparisons of DNA test results that used a sample of the Petitioner's blood obtained through the use of an illegal, sham arrest.

8.  The Petitioner's jury trial conviction was obtained as a direct result of ineffective assistance of counsel at trial.  This violated the Petitioner's right to effective assistance of counsel, as guaranteed by the United States Constitution and the Fifth and Fourteenth Amendments thereto and pursuant to <u>Strickland v. Washington</u>, 66 U.S. 668 (1984).

9.  The State of West Virginia erroneously denied habeas corpus relief to the Petitioner because the trial court violated the Petitioner's due process rights under the Fourteenth Amendment of the United States Constitution, and irreparably prejudiced the Petitioner's verdict, because the Petitioner's conviction was based on evidence insufficient to establish guilty beyond a reasonable doubt pursuant to <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979).

10.  The Petitioner argues that the West Virginia Supreme Court of Appeals' refusal to grant full appellate review of his direct appeal violated his due process rights as guaranteed by the United States Constitution, and the Fourteenth Amendment, thereto pursuant to <u>Evitts v. Lucey</u>, 469 U.S. 378, 405, 105 S. Ct. 830 (1985).

## <u>RESPONDENT'S MOTION FOR SUMMARY JUDGMENT</u>

Respondent's Memorandum of Law in support of his Motion for Summary Judgment first asserts that any grounds for relief that were not presented to the SCAWV in Petitioner's habeas appeal are unexhausted and procedurally defaulted.  State law provides that assignments of error that are not briefed are deemed to be waived. <u>See</u>, *e.g.*, <u>Dawson v. Allstate Insurance Co.</u>, 433 S.E.2d 268, 275 (W. Va. 1993)(per curiam)(quoting Syl. Pt. 3, <u>Higgenbotham v. City</u>

of Charleston, 204 S.E.2d 1 (W. Va. 1974)(overruled on other grounds O'Neall v. City of Parkersburg, 237 S.E.2d 504 (W. Va. 1977)).  (# 41 at 15).  Respondent's Memorandum of Law further states:

> In the case at bar, before presenting his case to the state habeas court, the Petitioner abandoned a majority of his claims. [FN 3 - Grounds 3-10.] None of these discarded claims were litigated during the Petitioner's state evidentiary hearings.  More importantly, none were briefed to the state supreme court.  Instead, Petitioner upon the advice of counsel, pruned away his claims until one was left: the credibility of Mr. Sells' confession.
>
> * * *
>
> Absent a showing of "cause" or a "fundamental miscarriage of justice" claims not raised in the highest state court are defaulted.  Clearly a fundamental miscarriage of justice did not take place in this case. "Cause" requires the Petitioner to "show that some objective factor external to the defense impeded defense counsel's efforts to raise the claim in state court." McClesky v. Zant, 499 U.S. 467, 493 (1991)(quoting Murray v. Carrier, 477 U.S. 478, 488 (1986).  The Petitioner has failed to present a scrap of evidence excusing his leap over state court into federal court.  This Court has no reason to address these claims.

(Id. at 16-17).

Respondent's Memorandum of Law further asserts that Petitioner has not rebutted the presumption of correctness of the state habeas courts' factual findings relating to the credibility of Tommy Lynn Sells' confession by clear and convincing evidence.  (Id. at 17-20).  The undersigned will further address these arguments infra.

38

<u>ANALYSIS</u>

**A.    Procedural default of claims in Petitioner's petition.**

The parties do not dispute that Grounds One and Two of Petitioner's section 2254 petition are exhausted and ripe for review by this court.  However, Respondent asserts that any grounds not raised in Petitioner's state habeas appeal are not exhausted and are barred from review by this court because of procedural default.

Petitioner's Response Memorandum (hereinafter "Response") addresses some issues concerning filings in his state court habeas proceedings, in an effort to overcome the Respondent's procedural default argument.  Petitioner's Response states in pertinent part:

> On February 3, 1995, Petitioner, by <u>pro se</u>, filed a State Habeas Petition with a motion for appointment of counsel in the Circuit Court of Kanawha County.  Said petition raised twenty-three grounds of constitutional violations. See Petitioner Section 2254 form petitioner mailed to this court on April 27, 2009, pursuant to the court's order dated March 24, 2009.  Also see Petitioner's Index of Exhibits at 4.
>
> * * *
>
> Petitioner also states that he did not, by <u>pro se</u> or by counsel abandon any of the other grounds raised for relief when his counsel filed a Supplemental Memorandum of Law in Support of Amended Petition for a Writ of Habeas Corpus in which counsel argued that Mr. Sells' confession constituted newly discovered evidence sufficient to overturn Petitioner's convictions. (Resp't Ex. 11).  Said memorandum was filed after the aforementioned depositions [of Sells and the Texas Rangers] and only in support of the same.  It did not constitute any waiver or abandonment of all other grounds which were raised.  See pages 38-45 of Petitioner's Section 2254 petition which addresses exhaustion of state

39

remedies.   (Docket Entry 1).

* * *

The West Virginia Supreme Court of Appeals on June 10, 2008, heard oral presentation of Petitioner's petition for appeal [from the denial of his Circuit Court habeas petition] originally filed on January 17, 2008. Petitioner's Index of Exhibits at Exhibit 14.  Said court on June 11, 2008, granted full review of said petition, and on July 31, 2008, ordered a briefing schedule.  Then on September 4, 2008, a <u>pro se</u> motion for leave to file a brief Amicus Curiae and the brief Amicus Curiae was filed in the WVSCA by a private citizen.  Said brief raised the grounds that the state court's lower tribunal failed to address which is explained to this court on pages 38-45 of Petitioner's Section 2254 petition (Docket Entry 1).  The WVSCA, however, on September 25, 2008, refused said motion and brief in a 4-1 vote.

Petitioner's counsel on September 2, 2008, filed a Brief of Appellant; then Respondent filed Appelles's [sic; Appellee's] Motion for Enlargement of [T]ime on October 1, 2008; the WVSCA on October 7, 2008, granted Respondent's motion; Respondent on November 3, 2008, filed a Brief of Appellee, which contained a deluge of falsehoods; Petitioner's counsel on November 18, 2008, filed reply of Appellant which pointed out Respondent's lies and misstatements of the evidence in this case. This concluded the briefing schedule pursuant to the WVSCA aforementioned order and pursuant to Rule 10. Briefs of the WVSCA Rules of Appellate Procedure.

Respondent without leave of the WVSCA on November 21, 2008, filed a brief of Appellee (as corrected) in an attempt to circumvent the rules and correct the lies contained in Respondent's original Brief of Appellee. Then Petitioner's counsel on December 4, 2008, filed a Motion for Leave of Court to File Revised Reply of Appellant to Respond to Revised Brief of Appelate [sic; Appellee], and Reply of Appellant to Corrected Brief of Appellee.  Subsequently, Respondent on December 10, 2008, filed a Motion to Strike Petitioner's counsel's aforementioned brief while complaining said attempts were inappropriate.

The WVSCA on February 24, 2009, heard oral argument of Petitioner's case.  Shortly thereafter said court denied

granting Petitioner a new trial on March 12, 2009.  Cite
as <u>State ex rel. Smith v. McBride</u>, 681 S.E.2d 81 (W. Va.
2009).  (Resp't Ex. 18).   See Petitioner's Index of
Exhibits at Exhibits 15, 16, 17, 18, 19, 20, 21, and 22
in support of the aforementioned events and claims
proffered by Petitioner.

On April 13, 2009, Petitioner's counsel filed a Petition
for Rehearing in the WVSCA.  Then Petitioner's counsel on
May 6, 2009, filed a motion to withdraw Petition for
Rehearing based on matters unknown to Petitioner at that
time.  The WVSCA on May 7, 2009, granted said motion.

On May 20, 2009, Petitioner by <u>pro se</u> filed a <u>Zain III</u>
petition for a writ of habeas corpus, motion for
discovery, motion for appointment of counsel, and a
motion for disqualification of judge in the Circuit Court
of Kanawha County.  Civil Case No. 09-MISC-182, <u>Smith v.
Ballard</u>.  Said petition and motions were filed because
Petitioner's case had been closed by the state court's
lower tribunal on or about January 18, 2006, and the
WVSCA decision cited in [<u>Zain III</u>] came about on June 16,
2006.  Said decision allows Petitioner to re-petition for
relief in state court, but the state court refuses to
address this matter.

On May 29, 2009, Petitioner by <u>pro se</u> filed a motion for
suspension of Rules, and Corrected Petition for Rehearing
in the WVSCA.  Shortly afterwards the WVSCA on June 17,
2009, refused to grant said motion to allow said petition
to be considered.  Petitioner's Index of Exhibits at
Exhibit 22.

To date, the state's lower tribunal has not ruled on
counsel's motion to withdraw or any of Petitioner's, by
<u>pro se</u> filings in Civil Case No. 09-MISC-182, <u>Smith v.
Ballard</u>.

(# 60 at 3-6).  Petitioner's Response also states that he filed a

Petition for a Writ of Certiorari concerning the denial of his

state habeas petition in the Supreme Court of the United States on

August 3, 2009.  The petition was denied on October 5, 2009.  <u>Smith

v. McBride</u>, No. 09-5890, 130 S. Ct. 323 (Oct. 5, 2009).  (<u>Id.</u> at 6-

7).  The undersigned notes that the certiorari petition has no effect on the timeliness or exhaustion of claims raised in Petitioner's section 2254 petition.  See Lawrence v. Florida, 549 U.S. 327, 127 S. Ct. 1079, 166 L. Ed.2d 924 (2007)(statute of limitations is not tolled during pendency of petition for writ of certiorari from denial of state habeas).

Petitioner's Response next addresses the claims he has raised in his section 2254 petition and makes a blanket assertion that each of those claims is cognizable in federal habeas corpus. Petitioner characterizes his claims as follows:

> The Petitioner does not admit to Respondent's claim that he has failed to state a claim for relief.  In fact, Petitioner has presented numerous cognizable claims in his Section 2254 petition including, but not limited to the following: Eighth and Fourteenth Amendment claims of actual innocence; violations of due process of law under the Fourteenth Amendment; Brady violations based on withholding of evidence by the prosecution which if made available would be exculpatory to petitioner; a Fourth Amendment claim of illegal search and seizure; constitutional ineffectiveness of counsel in violation of the Sixth Amendment; "cause and prejudice" or "miscarriage of justice" exceptions to the exhaustion requirement.  See, e.g., Murray v. Carrier, 477 U.S. 478, 485-88, 106 S. Ct. 2639, 91 L. Ed.2d 397 (1986)(recognizing cause-and-prejudice exception); Washington v. James, 996 F.2d 1442, 1447 (2d Cir. 1993)(recognizing "fundamental miscarriage of justice" exception).  Also see Murray, 477 U.S. at 496.
>
> Furthermore, Petitioner's claims have cast doubt on his guilt sufficient to satisfy Schlup's gateway standard for obtaining relief by review of all of his claims.  See Schlup v. Delo, 513 U.S. 298, 319-322, 115 S. Ct. 851, 130 L. Ed.2d 808 (1995); and House, 547 U.S. at 519.

(Id. at 7).  Petitioner further addresses the standard of review

that should be applied when addressing his claims under section 2254. (<u>Id.</u> at 8-9).

In the Argument section of his Response, Petitioner contends that Respondent's assertion that Petitioner procedurally defaulted any grounds for relief not presented to the State Supreme Court is false. Petitioner contends that Grounds Six and Seven of his section 2254 petition were exhausted through his direct appeal, and were never abandoned. (<u>Id.</u> at 12). Petitioner's Response further states:

> Again in order to prove to this court that Respondent is not being truthful, the Petitioner states all of his claims have been properly raised. The state courts just refused to either grant review or litigate the grounds that were raised. In support of this argument, Petitioner directs this court's attention to pages 36-45 of his Section 2254 petition (Docket Entry 1) and pages 2-5 and 25-32 of his petition's memorandum filed April 28, 2009, (Docket Entry 10), Proof that Petitioner never abandoned any of his grounds, nor did his counsel. And counsel never advised him to prune away any claims. All grounds were asserted.

(<u>Id.</u> at 13). Petitioner's Response further argues:

> Further, the state court's low and high tribunals (Kanawha County Circuit Court and WVSCA) possess the pertinent records in the Petitioner's cases which will help prove to this court that he exhausted the required remedies in relation to all the grounds raised in his federal habeas petition under Section 2254. Or that in the alternative, the aforementioned records prove circumstances exist that render such process ineffective to protect the rights of the application which is the Petitioner, 28 U.S.C. § 2254(B)(i) and (ii). In fact, WVSCA Case No. 970495. <u>Smith v. Trent</u>, is a petition for appeal from the circuit court's denial of habeas relief filed in early 1997. Kanawha County Circuit Court Civil Case No. 97-MISC-43 is a petition for a writ of habeas corpus, motion to reconsider based on newly discovered

evidence pursuant to Rule 33, motion for counsel, motion for evidentiary hearing, and motion to proceed in forma pauperis. These documents were filed on or about February 11, 1997. WVSCA Case No. 970803. SER Smith v. Trent is an original habeas petition filed on March 24, 1997. Kanawha County Circuit Court Civil Case No. 97-MISC-166 is a motion to expedite the above motion to reconsider based on newly discovered evidence filed on or about April 18, or 21, 1997. See pages 2-6 of Petitioner's Section 2254 (Docket Entry 1) and pages 1-26 of Petitioner's Section 2254 form petition filed on April 28, 2009, (Docket Entry 9).

Contrary to Respondent's arguments to this court about Petitioner's counsel's advice or strategy, the point is moot because Respondent argues hypotheticals and not true facts. The state petitions and motions in Kanawha County Circuit Court in Civil Case No. 97-MISC-43 raised 16 grounds for relief, the subsequent motion to expedite in Civil Case No. 97-MISC-166 was ordered consolidated under Civil Case No. 97-MISC-43 by order dated September 11, 2000.

Petitioner's initial state habeas petition was filed on February 23, 1995, in said court and is assigned Civil Case No. 95-MISC-118. This petition raised 23 grounds.

On June 23, 2003, Petitioner's private counsel filed both an amended habeas petition with a memorandum of law with Petitioner's pro se habeas petition and memorandum of law as amended and supplemented. Counsel's petition raised 7 grounds for relief and Petitioner's raised 22 grounds. The latter petition is 267 pages, with 6 exhibits, and a 35 page memorandum in support thereof.

Besides this proof, Respondent attempts to move this court to believe counsel's Supplemental Memorandum of Law in Support of Amended Petition for a Writ of Habeas Corpus filed on March 25, 2005, abandoned all other grounds for relief. This assertion is false! The present showing of cause in this case is contained in, but not limited to grounds 2, 4, 5, 7, and 8 of his federal petition. (Docket Entry 1 ad 19). Murray, 477 U.S. at 488; and Carpenter, 529 U.S. at 451-452.

(Id. at 13-15).

In further support of his assertion that procedural default of
Petitioner's claims not raised in his habeas appeal did not occur
or should be excused, Petitioner's Response states:

> Petitioner, by pro se and counsel from 1994 to present
> day has filed a deluge of petitions (appeals, habeas
> corpus, and mandamus) in the state courts. Besides this,
> numerous motions were also filed. Some of which have
> never been ruled on that were filed in 1997. After a
> decade, the [trial]-habeas court decided that it had to
> hold an evidentiary hearing on January 17-18, 2006. A
> hearing on a claim of newly discovered evidence that W.
> VA. Code Section 53-4A-1 does not allow. At this
> hearing, the court created a circumstance that rendered
> the state court corrective process ineffective to protect
> Petitioner's rights to due process in violation of the
> Fourteenth Amendment. This violation happened when the
> court failed to address all the grounds of constitutional
> rights violations contained in Petitioner's and his
> counsel's petitions; when the court failed to permit
> Petitioner and/or his counsel to develop the grounds in
> open court on the record; when the court failed to
> question Petitioner about which grounds he asserts and
> waives; when the court allowed prison guards to remain in
> the hearing room at all times during Petitioner's
> attorney-client off the record consultations; when the
> court refused to allow Petitioner to attend the
> evidentiary hearing in person and opted to use video
> conference which is not allowed according to the law for
> criminal-civil habeas corpus evidentiary hearings; when
> the court refused to allow Petitioner to attend the
> evidentiary hearing in person to testify in his own
> defense; when the court failed to recognize the alleged
> type-written recantation letter purportedly made by Tommy
> Lynn Sells on February 7, 2006, was false on its face;
> when the court failed to hold a hearing to address the
> Petitioner's right to cross-examine and confront Mr.
> Sells - alleged recantations; when the court failed to
> compel the state to procure available witnesses, Mr.
> Sells and the Val Verde County Deputy, James Poore, by
> video, to be questioned and confronted by the court, the
> prosecution and defense counsel regarding the false
> recantation; when the court failed to allow Petitioner to
> raise the illegal search and seizure ground pursuant to
> Stone v. Powell; when the court failed to allow counsel
> to develop the ground of ineffective assistance of trial

counsel even after habeas counsel brought it to the court's attention on January 18, 2006, on page 107 of the evidentiary hearing transcript. (Resp't Ex. 12).

Besides all of the above, the state [trial]-habeas court failed to enter the required by law comprehensive order of the court's findings and conclusions of law pursuant to Rule 9(c) of the rules governing state post-conviction proceedings pursuant to W. Va. Code Section 53-4A-7(c). See Petitioner's Exhibit 1 attached to (Docket Entry 1), and page 30 of (Docket Entry 9).

The above amounts to circumstances that exist which rendered the aforementioned state court corrective process ineffective to protect Petitioner's due process rights to a full and fair hearing on his federal constitutional claims. See pages 9 and 94-95 of January 17-18, 2006, evidentiary hearing (Resp't Ex. 12).

(Id. at 15-16).

When Petitioner's habeas counsel, Mr. Castelle and Mr. Koontz, filed a Petition for Appeal of the denial of Petitioner's amended circuit court habeas petition, they only raised two grounds for relief, which are the same claims raised in Grounds One and Two of Petitioner's federal habeas corpus petition. It appears that Petitioner is also asserting that he, or someone on his behalf, attempted to raise the other claims, which he contends were not addressed by the circuit court in the order denying his amended habeas corpus petition, in amicus curiae briefs filed in the SCAWV. Petitioner appears to be asserting that this attempt should either exhaust his state court remedies, or that the attempt to raise those claims should excuse his procedural default thereof. Petitioner's Response states:

>    Further, two motions [to] file Briefs of Amicus
>    Curiae with said briefs were filed on September 2, 2009,
>    in support of Petitioner's petition for appeal in the
>    WVSCA. Said briefs raised the claims wherein the trial-
>    habeas court failed to address all the grounds/claims of
>    federal constitutional dimension raised in Petitioner's
>    habeas petitions, by <u>pro se</u> and counsel. Said motions
>    were refused by a 4-1 vote on September 15, 2009, in the
>    Supreme Court Case No. 34155 <u>Smith v. McBride</u>, 681
>    S.E.[2d] 81 (W. Va. 2009). See Petitioner's Index of
>    Exhibits at Exhibit ___.

(<u>Id.</u> at 17).

Petitioner was represented by very experienced counsel in his
state habeas proceedings. Both Mr. Castelle and Mr. Koontz have
extensive experience in handling state criminal and habeas corpus
matters. Mr. Koontz filed an Amended Petition for Writ of Habeas
Corpus for Petitioner on or about June 19, 2003. The Amended
Petition for Writ of Habeas Corpus superceded or replaced the
previous petitions filed by Petitioner, when he was acting <u>pro se</u>.
Mr. Koontz had the opportunity to raise whatever claims he and
Petitioner felt were appropriate for review in that petition, which
only contained seven (7) grounds for relief.

Subsequently, on March 25, 2005, Mr. Koontz and Mr. Castelle,
who had been appointed to represent Petitioner by that time, filed
a Supplemental Memorandum of Law in support of the Amended Petition
for Writ of Habeas Corpus. (# 39, Resp't Ex. 11). The focus of
the Supplemental Memorandum was on the newly discovered evidence of
Sells' confessions. Contrary to Respondent's assertion, the
undersigned does not believe that the filing of this Supplemental

47

Memorandum waived the other grounds for relief raised in Petitioner's Amended Petition for a Writ of Habeas Corpus but, rather, supplemented Ground Four contained therein. Thus, the undersigned believes that Petitioner was still pursuing seven grounds for relief in the circuit court at that time.

An evidentiary hearing was conducted on Petitioner's Amended Petition for Writ of Habeas Corpus on January 17-18, 2006. During that hearing, Petitioner, by counsel, presented evidence that was relevant to his claim of newly discovered evidence concerning the alleged falsification of the DNA evidence (Ground One of Amended Petition filed in Circuit Court)(through the testimony of Dr. Frederick Whitehurst), his claim of newly discovered evidence that another person, Tommy Lynn Sells, had claimed that he committed the murders and that he is actually innocent (Ground Four of the Amended Petition)(through the video deposition testimony of Mr. Sells and the two Texas Rangers), and his claim that the State had failed to disclose allegedly exculpatory evidence (Ground Five) (through the testimony of Janet Smith Elswick and Janette Laws Kirk). Petitioner also presented the testimony of Dr. Daniel Spitz in order to challenge the testimony presented by Dr. Sopher at trial concerning the probable time of death of the victims, which he used to bolster his claim that someone else committed the crime, and that he is actually innocent. Petitioner did not present any evidence at the omnibus hearing concerning his claim of ineffective

48

assistance of counsel or his search and seizure claim.

At the conclusion of the evidentiary hearing, the presiding circuit court judge gave both parties a brief period of time to supplement the record with any additional materials they believed to be pertinent to their cases, and requested that the parties submit proposed findings of fact and conclusions of law. Thus, Petitioner was given the opportunity to address each of the claims he was raising. Furthermore, at the conclusion of the hearing, the court had the following colloquy with Petitioner and counsel of record:

> THE COURT: Now, how would you all like -- one of the matters that the rules of post conviction -- habeas corpus rules require that the Court do is inquire in the record whether the petitioner has raised all available grounds for habeas corpus relief that you're aware of at this time.
>
> We've had petitioners and petitions filed and now we have evidence, you believe it's newly found evidence on what you wish -- as far as I know. I'm asking here today if you believe that you have now raised the grounds that you wish to raise and believe to have raised on this matter?
>
> MR. CASTELLE: Your Honor, what I'd like to request at this time if it's appropriate is, since we have requested an opportunity to brief and argue the issues, what I'd like to do is request a transcript from the court reporter some of the testimony of witnesses of the last two days, the precise language may be critical. And then consultation with Mr. Smith.

> We'll be preparing our written brief in
> support of habeas corpus relief for the
> Court.   It's possible that in that
> preparation we will be able to eliminate
> a lot of issues.  We may want to argue
> some issues that didn't require evidence
> today but have previously been placed on
> the record.

> * * *

MR. MORRIS:    Judge, I don't know, and I wasn't on this
               case.  A check list prepared.  If not,
               that should be made part of this
               proceeding, before it's finally concluded
               with briefs and whatever.

THE COURT:     Let me just ask you all to read Rule 9B
               and confirm whether you believe that
               you've been -- whether all grounds have
               been raised and that's required to be
               confirmed.  And what I'll ask you all to
               do is prepare proposed orders with your
               respective -- any relief petitioner seeks
               denying relief to respondent -- proposed
               findings of fact and conclusions of law,
               very comprehensive referring specifically
               to matters that have been raised before
               this Court and in this petition, and
               submit those on a Word Perfect compatible
               disk.

(# 66, Ex. 12 at 239-240).  Then, in a follow-up hearing on March

6, 2007, at which time Petitioner was given an opportunity to

testify and declined to do so, the follow colloquy occurred:

THE COURT:     And you as attorneys I need you to answer
               this.   Do you all believe that I have
               denied you an opportunity to present any
               evidence before the Court in this
               proceeding?

MR. CASTELLE:  No, Judge. You provided that opportunity,
               and we acknowledge that.

> MR. KOONTZ:          As his assistant counsel, Your Honor, I
> also acknowledge that you have provided
> the Petitioner each and every opportunity
> to present evidence.  I think the basis
> of his motion not to testify today or his
> invocation of that right was that he was
> not here present with his counsel.  But
> absent that ruling, this Court has
> afforded him every opportunity to present
> evidence which he has asked to present in
> this matter.

(# 39, Ex. 14 at 17-18).  The Court further inquired of counsel as
to whether they had sufficient opportunity to communicate with
Petitioner in a confidential manner.  The attorneys confirmed that
they had sufficient opportunity to do so; however, Petitioner, who
was participating by video conference, complained that there were
correctional officers present in the room he was in, who could
overhear all of his communications with his lawyers.  (Id. at 18-
19).  Finally, the Court inquired of the parties as to whether they
wished to present any further evidence, and both the State and
Petitioner said no.  (Id. at 19).

When Mr. Castelle and Mr. Koontz filed Petitioner's Petition
for Appeal in the SCAWV, they elected to raise only two of the
seven grounds for relief in the habeas appeal.  Therefore, the
remaining claims raised in Petitioner's Amended Petition for Writ
of Habeas Corpus were deemed waived and are, thus, procedurally
defaulted.  The procedural default was further supported by the
SCAWV's refusal to accept the amicus curiae brief(s), which
apparently addressed grounds not raised by Petitioner's counsel in

51

the Petition for Appeal.

For these reasons, the undersigned proposes that the presiding District Judge **FIND** that the grounds raised in Petitioner's section 2254 petition that were not raised, either in his direct appeal or in his habeas appeal petition (that is, Grounds Three, Four, Five, Eight, Nine and Ten), are procedurally defaulted.

**B.   Ground Six - Denial of motion to suppress DNA results and Ground Seven - Denial of motion to suppress based on allegedly improper search and seizure.**

In Ground Six of his federal petition, Petitioner alleges that:

> the State of West Virginia erroneously denied habeas corpus relief to Petitioner because the trial court violated his due process rights under the Fourteenth Amendment of the United States Constitution, and irreparably prejudiced the verdict, when the trial court denied the defense motion to suppress DNA based statistical probability projections that were based on a novel calculation method not generally accepted by the scientific community.

(# 10 at 81).  In Ground Seven of his federal petition, Petitioner alleges that:

> the state courts erroneously denied habeas corpus relief to the Petitioner because the trial court violated his constitutionally protected right to be free of unreasonable searches and seizures when the trial court denied a defense motion to suppress evidence of comparisons of DNA test results that used a sample of [Petitioner's] blood obtained through the use of pretext, illegal, sham arrest.

(Id. at 90).

In response to Respondent's contention that Petitioner has not exhausted these claims, Petitioner asserts that both of these

claims were exhausted through his direct appeal. (# 60 at 12-13).
The undersigned has reviewed Petitioner's Petition for Appeal
following his conviction (hereinafter "Petition for Direct
Appeal"), which was provided to the court by Respondent's counsel,
and has been made a part of the record herein (# 75), and has been
provided to Petitioner, by Order entered this same date (# 74).
Based upon a review of that Petition for Direct Appeal, the
undersigned has determined that Petitioner's claim concerning the
denial of the motion to suppress the DNA based statistical
probability projections ("Assignment of Error I") was raised as a
challenge based on state evidentiary rules and cannot be construed
to have exhausted a federal due process claim, such as that raised
in Ground Six of Petitioner's section 2254 petition. Thus, the
undersigned proposes that the presiding District Judge **FIND** that
Ground Six of Petitioner's section 2254 petition was not exhausted
by his direct appeal, and is procedurally defaulted because it was
not raised as a federal constitutional claim in Petitioner's state
habeas appeal.

Concerning Ground Seven of Petitioner's section 2254 petition,
Petitioner did assert a violation of his Fourth Amendment rights
based upon an allegedly unreasonable search and seizure in
"Assignment of Error II" of his Petition for Direct Appeal.
Petitioner initially moved to suppress the blood and hair samples
that were taken from him, pursuant to a court order, after he was

53

arrested on a traffic violation stemming from the wreck and abandonment of the Walls' vehicle. Petitioner claimed that his arrest on the traffic violation was a pretext or sham in order to obtain his blood and hair samples in investigation of the murders, when they had no probable cause to arrest Petitioner for murder.

However, during a pre-trial motions hearing on December 10, 1992, Petitioner's counsel elected not to pursue the motion to suppress the blood and hair samples. The transcript from that hearing states:

> MR. TURNER:   Judge, the only other item that still would be an issue in our general suppression motion about blood evidence would be that part of the motion dealing with pretextual arrest.
>
> We've had a fair amount of time to discuss the matters with Mr. Smith, and as a result of those discussions and analysis of your ruling that you made this morning, the defendant at this time is not going to, does not intend to go forward with the pretextual arrest suppression issue, but reserving the right, of course, that to the extent it becomes relevant during the trial that those matters could be revisited, but not as a suppression matter, Judge.

(# 40, Ex. 19 at 1377). Petitioner's counsel then elected to cross-examine Detective Johnson, the investigating officer, about Petitioner's arrest and the collection of the blood and hair samples. (Id. at 1954-1960).

Because Petitioner did not contest the admissibility of this evidence during the trial, Petitioner waived his right to challenge

the search and seizure of that evidence on appeal or in his habeas corpus proceedings. Nevertheless, Petitioner had a full and fair opportunity to litigate his Fourth Amendment claim in the state courts and, thus, his Fourth Amendment claim is not cognizable in this federal habeas corpus proceeding. See Stone v. Powell, 428 U.S. 465, 494 (1976); Sallie v. State of North Carolina, 587 F.2d 636, 639 (4th Cir. 1978)(where opportunity for the full and fair litigation of a fourth amendment claim, but opportunity is not pursued, petitioner is foreclosed from pursuing relief in federal habeas corpus). Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner's claim contained in Ground Seven of his federal petition is not cognizable in federal habeas corpus, and that Respondent is entitled to judgment as a matter of law on that ground for relief.

**C.    Ground One - Newly discovered evidence and claim of actual innocence and miscarriage of justice.**

The undersigned has found that Grounds Three through Six and Eight through Ten of Petitioner's section 2254 petition are procedurally defaulted, and that Ground Seven is not cognizable in federal habeas corpus. Petitioner has attempted to overcome his alleged procedural default of Grounds Three through Six and Eight through Ten of his federal habeas petition by making a claim that he is actually innocent and that his conviction has resulted in a miscarriage of justice.

Petitioner also argues that his "actual innocence" argument, as pled in Ground One, should be treated as a free-standing constitutional claim under the Eighth Amendment.   However, the Supreme Court has emphasized that demonstrating actual innocence is only a gateway to allow federal habeas review of a procedurally defaulted claim, and is not itself a constitutional claim upon which habeas relief may be granted in a non-death penalty case. Schlup v. Delo, 513 U.S. 298 (1995).   Thus, Petitioner's assertion that he should be able to assert a free-standing constitutional claim based upon actual innocence because his two life sentences are the functional equivalent of a death sentence cannot succeed.

Having determined that Petitioner has procedurally defaulted claims that he seeks to raise, the undersigned will now turn to his argument that he can meet the standard allowing review of those claims under Schlup v. Delo.   As stated in Schlup:

> The meaning of actual innocence . . . does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty. It is not the district court's judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable jurors would do.   Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

513 U.S. at 329.   The Schlup Court further observed:

> In assessing the adequacy of Petitioner's showing, therefore, the district court is not bound by the

56

> admissibility rules that would govern at trial. Instead,
> the emphasis on "actual innocence" allows the reviewing
> tribunal to consider the probative force of relevant
> evidence that was either excluded or unavailable at
> trial.

Id. at 328. The District Judge must evaluate the credibility of the new evidence, see O'Dell v. Netherland, 95 F.3d 1214, 1250 (4th Cir. 1996), and the evidence must be examined in light of the entire record.

Petitioner's "actual innocence" argument is raised as part of Ground One of his section 2254 petition in which Petitioner asserts that the state courts erroneously denied him habeas corpus relief in the form of a new trial based on newly-discovered evidence. In Ground One, Petitioner asserts that he should receive a new trial because the newly-discovered confession of Tommy Lynn Sells and the circumstances surrounding the confession meet all of the criteria for granting a new trial based upon newly-discovered evidence in state and federal court. (# 10 at 32). Petitioner cites the standard for granting a new trial based upon newly-discovered evidence under West Virginia law. The SCAWV has held that:

> A new trial will not be granted on the ground of newly-
> discovered evidence unless the case comes within the
> following rules: (1) The evidence must appear to have
> been discovered since the trial, and, from the affidavit
> of the new witness, what such evidence will be, or its
> absence satisfactorily explained. (2) It must appear
> from the facts stated in his affidavit that [the
> defendant] was diligent in ascertaining and securing his
> evidence, and that the new evidence is such that due
> diligence would not have secured it before the verdict.
> (3) Such evidence must be new and material, and not
> merely cumulative; and cumulative evidence is additional

> evidence of the same kind to the same point.   (4) The
> evidence must be such as ought to produce an opposite
> result at a second trial on the merits.   (5) And the new
> trial will generally be refused when the sole object of
> the new evidence is to discredit or impeach a witness on
> the opposite side.

In re: Renewed Investigation of the State Police Crime Laboratory,

Serology Division, 633 S.E.2d 762, 769 (W. Va. 2006); State v.

Frazier, 253 S.E.2d 534 (W. Va. 1979).   (Id. at 34).

Petitioner's Memorandum in Support of his section 2254

petition further argues:

> As set forth herein, the state court's decision in
> denying to grant the Petitioner a new trial is a
> fundamental miscarriage of justice and a[n] abuse of the
> Court's discretion because it is based on underlying
> factual findings that are clearly erroneous.

> Therefore, in the following review of the five-part
> standard for granting a new trial based on newly-
> discovered evidence, the Petitioner not only meets all
> five requirements of the state, but he meets the United
> States Supreme Court's "cause and prejudice" requirement
> of an "actual innocence" exception, known by other names
> such as the "fundamental miscarriage of justice"
> exception as cited in Murray v. Carrier, 477 U.S. 478, 91
> L. Ed.2d 397, 106 S. Ct. 2639 (1986).  See also, Schlup
> v. Delo, 513 U.S. 298 (1995).

(Id.)  Petitioner then argues how the evidence of Sells' confession

meets the five criteria.

There is no dispute that the evidence of Sells' confession

came to light many years after Petitioner's trial.   Petitioner's

Memorandum states:

> Sells ultimately confessed a total of five times,
> all after trial.   1st to the Texas Rangers Sgt. John
> Allen and Sgt. Coy Dale Smith on April 12, 2000 (Habeas
> Tr. 20); 2nd during the filming of the CBS News 48 Hours

television program, first aired on February 1, 2001, (Petitioner's State Habeas Exhibit No. 2); 3rd to biographer Diane Fanning, on April 7, 2004, (Petitioner's State Habeas Exhibit No. 6, Habeas Tr. 165); 4th to Wendy Campbell and Jane Brumfield, on May 11, 2004, (Attachment D to Petitioner's Motion for Leave of Court to Conduct Depositions, filed June 9, 2004); and 5th in Sells' deposition, under oath and subject to cross-examination by the State of West Virginia, on September 29, 2004, (Habeas Tr. 98 and Petitioner's Exhibit Marked # 7 Deposition of Tommy Lynn Sells). All five (5) of these confessions occurred after the date of the Petitioner's trial with the fifth confession under oath coming approximately twelve years after the Petitioner's December 30, 1992 convictions.

(# 10 at 34-35). Petitioner further asserts that this newly-discovered evidence could not have been discovered previously, even with due diligence. Petitioner argues:

As was confirmed by the habeas testimony of Sells' biographer, and by the biography itself, Sells was a homeless drifter, committing serial murders across the country, but evading capture because of his careful pattern of cleaning up the crime scenes to remove all traces of himself. (Habeas Tr. 153; Respondent's Habeas Exhibit No. 3). Because Sells' identity as a serial killer was not known by the police until the year 2000, it was not possible for the Petitioner's defense counsel, with due diligence, to have identified Tommy Lynn Sells and to have elicited his sworn confession to the Cabin Creek murders under oath before the date of the Petitioner's 1992 trial.

(Id. at 35). Petitioner further argues that this evidence is new and material and not cumulative, as there is no other evidence of a confession to the crimes by Sells or anyone else. (Id.) These factors appear to be undisputed as well.

However, Petitioner next discusses the fourth factor; that the newly-discovered evidence is such that it ought to produce an

59

opposite result in a second trial on the merits.  On this issue,
Petitioner argues that Sells' confession is substantially
corroborated, and that the purported recantation he allegedly made
is "both inadmissible and inherently contradictory."  (Id.)

Petitioner spends pages of his Memorandum describing how
Sells' confessions contained extensive facts that were consistent
with evidence found in the investigation of the Cabin Creek
murders.  Specifically, Petitioner states that Sells' confessions
contained extensive details that:

> Sells committed a double homicide;
> in Kanawha County, West Virginia;
> in September 1991;
> the victims were a mother and daughter;
> the victims resided on Cabin Creek near the Boone County
> line;
> the daughter's name was Pamela;
> Sells met Pamela at the Route 60 Lounge;
> the elderly mother was in poor health;
> the victims owned a white Ford Taurus automobile;
> Sells stayed in the victims' upstairs attic for two or
> three days prior to the murders;
> Sells traded the victims' television set for narcotics;
> during the argument over the sale of the television,
> Sells repeatedly stabbed the victims;
> the stabbing was committed in the downstairs area of the
> residence;
> Sells removed the victims' pants to make the attack look
> sexually motivated;
> Sells left the victims' automobile behind and hitchhiked
> out of the area.

Petitioner cites to the deposition of Sgt. Allen, State Habeas Ex.
No. 1, pp. 2-3.  (# 10 at 35-36).  Petitioner further asserts that
Sells' description of the facts surrounding the crimes remained
consistent in his various statements/confessions.  (Id. at 36).

60

Petitioner further asserts that Sells' description of how he arranged the victims' bodies was accurate when compared to the crime scene diagram prepared by police. (Id.) His Memorandum further states:

> With respect to the younger female victim he was able to explain that he placed her between a doorway maybe halfway between a guest room or a bedroom and a day room. With respect to the location of the older female victim, Sells said she was in the kitchen. In fact, when reviewing the crime scene sketch done by one of the investigating police officers, Sells['] description is truly accurate with the placement of their bodies. (See Petitioner's Exhibits Marked #5 and #6 May 11, 2004, Interview - Confession of Tommy Lynn Sells and June 9, 2004, Motion to Depose Tommy Lynn Sells with Attachments A, B, C & D.)
>
> Sells recalled the entrance he used to the victims['] home being through a side door leading into the kitchen. He was able to describe with specificity the eyeglasses of the oldest victim which he claimed were round, kind of oversized, thick and he called them coke bottle glasses. Plus, he was also able to remember specific details about the outside of the victims['] house. For instance, he remembers a lover's swing and a wheelchair ramp. He provided information that the victims resided near the Boone County line, what their living room furnishings consisted of an older television, a coffee table, end tables, night table, couch and they had a small indoor pet dog. All of these representations are accurate with the representations of the victims['] home and crime scene sketch.

(Id. at 36-37).

Petitioner further asserts that the facts of this case are consistent with Sells' known *modus operandi* in his serial killings across the country, including multiple stab wounds, rape of victims, leaving victims in postured, sexually suggestive positions, murders inside homes in rural areas, and careful

cleaning of the crime scene in order to leave no evidence that is traceable to him. (Id. at 37).

Petitioner then spends a fair amount of his Memorandum in support of his section 2254 petition disputing other evidence used by the state courts to support a finding that a new trial was not warranted. For example, Petitioner argues that the canteen found at the crime scene does not match the canteen that was said to be missing from Curtis Walls' home (the place where Petitioner was staying at the time of the crimes). Petitioner further argues that his fingerprints were not found on the canteen or any other evidence at the crime scene. (Id. at 38). Petitioner further argues that the two witnesses who saw a man walking up the road near the victims' home wearing camouflage, with a knife and canteen on his belt, did not identify Petitioner in a photo array/lineup. (Id.)

Petitioner's Memorandum further states:

> Besides this the State Court hypothesized to come up with a pro-prosecution opinion based on the circumstantial evidence that the Petitioner stole the victims['] car, the Petitioner reportedly wore a teddy bear T-shirt, the Petitioner reportedly transferred stolen property - a vcr, walkman stereo with headset, and a cb radio allegedly belonging to the victims to Elaine Denise Morgan and the Petitioner reportedly had a canteen. Circumstances the State Courts put a spin on to claim the Petitioner must be the perpetrator of a double felony murder. However, none of the property noted in the State Court's decision was found in the Petitioner's possession and/or the Wall residence [where] he was a live-in house guest. Also none of his fingerprints were identified on any of the stolen or missing property and the State Court record does not indicate the day or time

62

Petitioner allegedly stole these items or whether or not
he received them from another individual in a property
transfer before or after the victims were murdered.

(Id. at 39).

Because the state habeas courts' decisions relied heavily upon
inaccuracies in Sells' confessions concerning a description of the
attic room in which he allegedly stayed for several days before the
murders, and concerning an afghan that was allegedly in the
victims' home, but was actually photographed in the Walls' home,
Petitioner's Memorandum of Law attempts to explain away these
inaccuracies and demonstrate that Sells' confession was not
fabricated. The Memorandum states in pertinent part:

> Further, the State Court[s] point out Sells made
> four (4) major mistakes in his confession in regards to
> the description of the attic and the location of the
> bathroom, one indoor house dog when there were reportedly
> two dogs, a cb radio and a black afghan on a brown couch
> that's reportedly in the Walls['] residence. However,
> the crime scene sketch the Petitioner's habeas counsel
> Wendy Campbell obtained from the Kanawha County Sheriff's
> Department shows a bathroom is right below the attic
> beside the ground floor bedroom. This bathroom is a few
> feet from the attic steps, and the wooden mini stairs
> leading up to and from the attic are located in the
> ground floor bedroom the bathroom is next to.

> Through an independent investigation, Jane
> Brumfield, a paralegal and private investigator in the
> Kanawha County Public Defender's Office, was able to
> verify that there was an attic that had been turned into
> a sleeping room in the victims['] home. Pertinent
> information disputing the State Court's findings that the
> attic in the victims['] home was not what Sells stated it
> to be - a bedroom. (See Petitioner's Exhibits Marked #5
> and #6 May 11, 2004, Interview - Confession of Tommy Lynn
> Sells & June 9, 2004, Motion to Depose Tommy Lynn Sells
> with Attachments A, B, C & D.)

The attic room was converted into the guest bedroom located over top the ground floor bedroom and very close to a bathroom.

* * *

The point is the State Court[s] used these so called two (2) errors to opine Sells made in his confession to justify that it's plausible someone told Sells what to say and his confession to the murders is false and to justify denying the Petitioner a new trial claiming Sells committed errors in his confession regarding his description and memory of the attic, location of a bathroom, one or two inside house dogs and a black afghan.  The truth is Sells was right and he told the truth about what he could remember to the best of his ability and memory of these crimes.

* * *

Anyway, the State Court[s] opined that it's plausible someone had access to the case files and provided Sells with incorrect information, but the state provides no proof of it whatsoever based on the fact there is no proof because nobody told Sells what to say before, during and after he waived his Miranda Rights and gave his first UN-prompted confession to the Texas Rangers on April 12, 2000, including his other confessions that he committed the Cabin Creek murders and not the Petitioner.  The State Court[s] are hypothesizing, assuming and guessing to justify their opinions that the newly-discovered evidence will not produce a different result in a new trial.  But the confession of Tommy Lynn Sells is further supported by the habeas testimony of Janet Smith Elswick who is of no relation to the Petitioner.  Ms. Elswick testified that she seen [sic; saw] the victims alive, one or two days after the time the State claimed the victims had been killed and that the Petitioner was in the vicinity of the victims' home in Leewood, WV on Cabin Creek.  Habeas Tr. 44-47.

(Id. at 40-42).  Petitioner further argues that, in addition to Ms.

Elswick's testimony at the habeas hearing, which was not presented

at trial, witness Steven Michael Pritt also testified to seeing the

64

victims still alive at 6:00 p.m. on the date of the murders and, therefore, Petitioner could not have committed the murders because it is documented that he made a phone call from a pay phone in Boone County that night at 6:11 p.m.  (Id. at 42).

Finally, Petitioner argues that the opinion of his medical expert, Dr. Spitz, at the habeas hearing supports a finding that the time of death was substantially later than that offered by Dr. Sopher at trial (based upon evidence of rigor mortis and tails on spermatozoa that were allegedly found in Ms. Castaneda's vagina), and that the later time of death supports Sells' confession because Petitioner was not in the area at the later time.  (Id.) Petitioner argues that all of this evidence, which was not presented at trial, constitutes newly-discovered evidence that would likely change the outcome of his trial.

Petitioner then argues that the State's assertion that Sells' confession was fabricated is implausible, and attempts to discredit the theories offered by Respondent of how Sells could have obtained the information about the crimes.  Petitioner asserts that Sells was not on death row when he was incarcerated in West Virginia and, thus, it is extremely implausible that he would have conspired with Petitioner at that time to falsely take responsibility for the crimes.  Petitioner further argues that, after both he and Sells were transferred to the Mount Olive Correctional Complex, they were not housed together, so they could not have discussed the crimes at

65

that time.   Petitioner states that the State has offered no
evidence to demonstrate that Petitioner and Sells ever knew each
other. (Id. at 43-44).

Petitioner further argues that it is implausible that Sells
would be able to remember extensive details of crimes that someone
else committed, in light of his history of drug abuse, transiency
and limited intellect.  Petitioner argues that Sells had difficulty
remembering details of his own crimes.  (Id. at 44).  Petitioner
also asserts that it is implausible that he could have kept in
touch with Sells and surreptitiously communicated with him
following his arrest for capital murder in Texas.  (Id.)

Finally, Petitioner asserts that it is implausible that Sells
could have learned or remembered the details he knew about the
murders and the crime scene from the "Master Detective" article
that was published about the crimes in September of 1993, and
further asserts that there were details Sells knew about that were
not in the article; i.e., the name of the Route 60 Lounge and the
fact that a television was missing from the victims' home. (Id. at
45).  Petitioner states that it is "difficult to conceive how Sells
could have learned of the disappearance of the victims' television
set, unless he was actually present and committed the Cabin Creek
murders, as he confessed."  (Id.)

Petitioner's Memorandum further argues:

Despite all of the reasons in support of the
implausibility of fabrication, as set forth above, the

Circuit Court of Kanawha County in its final Order of
September 17, 2007, and the WVSCA on March 12, 2009, in
its written opinion affirming the denial of the
Petitioner's petition for a writ of habeas corpus held
just the opposite, and ruled the confession was, in fact,
a fabrication.  In so ruling, the state emphasized the
few details in Sells' memory that appear to be erroneous,
while ignoring the overwhelming numerous details, set
forth, that are in fact true and accurate.

(Id. at 45).

Petitioner further argues that there is no DNA evidence that

was put forth at trial that would contradict or refute Sells'

confession, and further attempts to argue that the fact that his

blood, and that of one of the victims, was found on the teddy bear

T-shirt, which was known to be in Petitioner's possession, could

have gotten there by cross-contamination.   (Id. at 46-47).

Petitioner further states:

In summary, the United States Supreme Court recently
discussed, in detail, the problems of cross-contamination
involving small DNA samples during the early years of DNA
testing in the FBI Crime Laboratory.  See House v. Bell,
126 S. Ct. 2064, 2078-83 (2006).  As [The USSC] stated,
after reviewing testimony about possible cross-
contamination, "whereas the bloodstains, emphasized by
the prosecution, seemed strong evidence of House's guilt
at trial, the record now raises substantial questions
about the blood's origin."  126 S. Ct. at 2083.

(Id. at 47).

Petitioner's Memorandum further argues that, in addition to

the "substantial corroboration" of the Sells' confession and the

implausibility that it was fabricated, additional support for the

credibility of the confessions comes from the fact that Sells'

confession to another crime in Illinois was found to be credible

67

and resulted in the conviction of another defendant being
overturned.  See People v. Julie Rae Harper, Case No. 04-CF-104 (2d
Judicial Cir., Ill).  Petitioner argues:

> Sells also recanted his confession in the Harper case --
> and recanted at the same time he purportedly recanted in
> the Petitioner's case.  (Tr. February 17, 2007, Habeas
> hearing, p. 8; "Killer Conservation" [sic; Conversation],
> Del Rio News Herald Article entitled "Killer
> Conservation," [sic; Conversation], February 9, 2006).
> However, in a new trial where the jury heard both the
> confession of Sells and his purported recantation, Harper
> was acquitted based solely on Sells' confession despite
> the prosecution['s] claims that he recanted.  People v.
> Julie Rae Harper, Case No. 04-CF-104 (2d Judicial Cir.,
> Ill , July 26, 2006); (See Copy of Transcript of ABC News
> 20/20 Program aired March 9, 2007, Marked #9 in docket #
> 1.)
>
>      In fact, the acquittal of Julie Rae Harper, in a
> second trial where the confession of Tommy Lynn Sells was
> admitted, is persuasive evidence that the confessions of
> Sells are compelling, and the Petitioner would also
> receive a different verdict in a new jury trial, once all
> the detailed confessions of Sells admitting to committing
> the September 1991, Cabin Creek murders are introduced in
> a new trial of the Petitioner when compared to the
> purported one (1) page written recantation letter that is
> proved to be false on its face.

(Id. at 48).

Petitioner also points to the West Virginia case of State v.
Beard in support of his claim.  Petitioner asserts that, similar to
his own case, in the Beard case, Dr. Sopher changed his opinion
concerning the time of death from one time based upon the status of
rigor mortis in the victims' bodies, to a time that fit the time
period in which the defendant in that case was known to be present
at the crime scene.  Petitioner further points out that, similar to

68

the case at bar, after Beard was convicted of the crime, a known serial killer confessed to committing the murders.  A second trial was permitted, based upon this subsequent confession, and Beard was acquitted.  Based upon the similarities between his case and these other cases, and the change in outcome of those cases, Petitioner argues that a jury's hearing of Sells' confession at a new trial would produce a different outcome.  (<u>Id.</u> at 48-49).

Petitioner further argues that the evidence of Sells' confessions would not be offered solely to impeach or discredit any other witnesses that testified for the State but, rather, would be offered as substantive evidence that someone other than Petitioner committed the crimes.  (<u>Id.</u> at 49).  Thus, Petitioner argues that the evidence of Sells' confessions meets all five requirements for granting a new trial based upon newly-discovered evidence, and that the state courts' decisions denying him habeas corpus relief were legally and factually incorrect.

Petitioner further argues that the evidence of Sells' confessions to the crimes demonstrates that he is actually innocent of the crimes.  As previously discussed, this court will not review this claim as a substantive claim for relief under the Eighth Amendment but, rather, only to determine whether the court may review Petitioner's other procedurally defaulted claims.

Respondent's Memorandum of Law in support of his Motion for Summary Judgment asserts that "[a]bsent a showing of 'cause' or a

69

'fundamental miscarriage of justice' claims not raised in the highest state court are defaulted." (# 41 at 17).  The Memorandum further asserts:

> Clearly a fundamental miscarriage of justice did not take place in this case.  "Cause" requires Petitioner to "show that some objective factor external to the defense impeded defense counsel's effort to raise the claim in state court."  <u>McClesky v. Zant</u>, 499 U.S. 467, 493 (1991)(<u>quoting</u> <u>Murray v. Carrier</u>, 477 U.S. 478, 4888 (1986).  The Petitioner has failed to present a scrap of evidence excusing his leap over state court into federal court.  This Court has no reason to address these claims.

(<u>Id.</u>)

Respondent's Memorandum of Law further argues that Petitioner has not rebutted the state habeas courts' factual findings that Sells' confession was not credible.  The Memorandum states:

> Notwithstanding the Petitioner's onerous burden of proof, he has failed to provide this Court with any competent evidence undermining the State court's factual findings.  Sells originally confessed to these murders three months after he was arrested in Val Verde, Texas, for murdering Katy Harris and slashing Krystal Surles' throat.  The Texas authorities charged him with murder and he was facing the death penalty.  Krystal Surles had witnessed the murder and was prepared to testify for the State.  Knowing this, Sells began to confess to several different murders which he had committed across the country, including the Cabin Creek murders which he claimed came to him in a dream.

> Sells repeatedly stated that he spent approximately two to four days living in the victims' attic.  He described it as finished like a bedroom. (Resp't Ex. 12 at 26.)  During his evidentiary deposition, he testified that it was an "[a]partment type room with a bathroom – just a[n] attic with a[n] apartment in it." (Resp't Ex. 8 at 19.)  He also claimed that Ms. McClain did not know he was there until the day she was murdered.  Sells also referred to a small dog, a black afghan, and a brown couch.

The State called Ms. McClain's son-in-law, Thomas Lee. (Resp't Ex. 12 at 194.) Because his wife was appointed executor of the estate, Mr. Lee went through Ms. McClain's entire house a week after the murders. (Resp't Ex. 12 at 195-96, 206.) He described the attic as hot, dusty, and dirty. Ms. McClain had stored her Christmas decorations and a trunk up there. A photograph demonstrated that a person at the bottom of the stairs would have been capable of seeing inside the attic. There was a single boarded up window at one end, and a burned out lightbulb hanging from the ceiling. (Resp't Ex. 12 at 197.) There was an old mattress that had fallen onto the floor after leaning against the wall. Mr. Lee testified that there were no indications that anyone had slept up there. (Resp't Ex. 12 at 198-99.) There was no bathroom. (Resp't Ex. 12 at 199.) During trial, a photograph of the downstairs was accidentally labeled as a phot of the upstairs bedroom. (Resp't Ex. 12 at 212.) Clearly, [Sells] was lying about the attic. He had never seen it, never stayed there, and could not describe it. His testimony conformed to the mislabeled exhibit, not the real home.

Sells also claimed that he stole a CB radio from the McClain home. In fact, this was the same radio taken by the [Petitioner] and dropped off at Denise Morgan's home. (Resp't Ex. 8 at 56-57; Resp't Ex. 12 at 217.) Sells also testified that the victims had a small or medium-sized dog that did not try to bite him during the murders because he was good with animals. (Resp't Ex. 8 at 64-65.) In fact, the victims had two dogs -- one, a Pug, which they kept in a cage, and a Chihuahua, which was later found dead in the victims' laundry room. Sells claimed that the victims owned a brown couch with a black afghan. In fact, no such afghan was recovered. The State accidentally introduced a photo of an afghan from another residence.

(Id. at 18-19).

Respondent then addresses Petitioner's claim that it is implausible that Sells could have communicated with Petitioner and learned anything about the Cabin Creek murders while they were incarcerated together in West Virginia. Respondent's Memorandum of

Law notes that, at the habeas hearing, Brian Keith Pringle, a
correctional officer at the Kanawha County Jail at the time of
Petitioner's trial, testified that Petitioner and Sells were housed
in the same section of the jail from May 1992 to sometime in 1993.
He further testified that each prisoner had at least an hour a day
to converse with other prisoners in the same section. (<u>Id.</u> at 19).
The Memorandum of Law further asserts:

> [Petitioner] claims that it is "implausible" that he
> and Sells discussed [Petitioner's] trial while
> incarcerated in the same jail and same section. He mis-
> characterizes these sort of conversations as
> conspiracies, hatched before Sells was re-arrested in
> Texas and sentenced to death. Clearly, Sells would have
> no reason to believe he was facing a death sentence in
> Texas while incarcerated with the [Petitioner]. The
> State has never argued that both parties "conspired" to
> muddy the waters by having Sells falsely confess. Sells
> is an opportunist, with information he obtained while
> speaking with the [Petitioner]. He chose to use that
> information when he felt it suited his interest.

(<u>Id.</u> at 20). Respondent contends that Petitioner's section 2254
petition fails to demonstrate that his confinement contravenes the
rights and protections guaranteed by the United States
Constitution, its laws or its treaties, and that the petition
should be denied and dismissed with prejudice. (<u>Id.</u> at 21).

Petitioner's Response argues:

> Petitioner asserts his case has presented some new
> reliable evidence that was not presented at trial, and
> this court's analysis is not limited to such evidence.
> This is one of several reasons why the District Court
> should hold an evidentiary hearing in this case, and deny
> Respondent's motion for summary judgment. Sure the court
> may allegedly opine that Petitioner's free-standing
> innocence claims do not satisfy <u>Herrera</u>. However, to be

72

sure, the Petitioner argues the claims raised in his federal petition, memorandum of law, and exhibits, have cast considerable doubt on his guilt -- doubt that is sufficient to satisfy <u>Schlup</u>'s gateway standard for obtaining federal review despite a state procedural default.  <u>Schlup</u>, 513 U.S. 326-327, 115 S. Ct. 851.

As to the state procedural default issue - blood stains on evidence - Sells' five confessions - Petitioner's post-conviction habeas witnesses regarding newly discovered evidence (i.e. Tommy Lynn Sells' confessions); Dr. Daniel J. Spitz's time of deaths testimony; Jeanette Kirk's and Janet Elswick's testimony; Frederick W. Whitehurst's testimony; Sells' deposition; Sells' false recantation; and all the claims raised in Petitioner's federal petition, memorandum, and exhibits. Then this court has credible evidence it knows about now that the Petitioner's 1992 trial jury did not.  A new murder suspect - new evidence - questions left open by the failures of the state [trial]-habeas court - due process.  Therefore, the Petitioner has not and nor has he ever failed to present a scrap of evidence excusing an alleged leap over state court into federal court.  In fact, the evidence presented is more than enough to fill Respondent's recycle bin many times over with credible scarp [sic; scraps] to pass the <u>Schlup</u> standard, the show cause and prejudice test, and a fundamental miscarriage of justice exception.  All of which have taken place in this case.

Wherefore, Petitioner respectfully moves this court to thoroughly review the entire state court files and not just the bits and pieces of Respondent's choice.  In doing so, the court will see including, but not limited to, the fact that the only direct evidence of the sole count of first degree sexual assault dropped out of the state's case, so, too, did a key piece of the state's case in chief falsely linking the Petitioner to the crimes.  In that light, the Petitioner's odd possession of certain items and his statements to authorities, while still opined potentially incriminating, might now appear less suspicious based on the aforementioned evidence and testimony presented at the Petitioner's state court habeas hearings and during the appellate proceedings in the WVSCA.  With this in mind, Petitioner asserts that he has presented credible and troubling evidence that Mr. Sells is the real murderer of Mrs. McClain and Ms. Castaneda, which has cast doubt on his guilty sufficient

to justify <u>Schlup</u>'s gateway standard for this court.

(# 60 at 17-18).  Petitioner's Response adds:

> With respect to the "fundamental miscarriage of
> justice" exception, Petitioner has shown a sufficient
> argument - most particularly on the basis of facts that
> the state court[] has had at its disposal since before
> this habeas case began, but that Petitioner did not learn
> until years later.  Based only on the facts that were
> available during the state proceedings - in particular,
> the fact that the DNA recovered from the victim(s) bodies
> excluded Petitioner, combined with the altered time of
> deaths and all the contentions presented in this case -
> there is a real possibility that the grounds raised in
> Petitioner's federal petition with memorandum of law
> 'ineffectiveness of Smith's trial counsel' resulted in
> the conviction of a man who is actually innocent.  That
> possibility is rendered all the more troubling by the
> fact, revealed during the state court, and now these
> federal proceedings, that the state-respondent has
> persistently failed to take advantage of its ability to
> investigate the man - Tommy Lynn Sells, who eventually
> confessed five times that he alone committed the double
> murder and not the Petitioner, and who falsely recanted.

> Therefore, if this court will thoroughly review all
> the facts, it should conclude that Petitioner
> sufficiently exhausted his legal opportunities to seek
> review in the state courts of all the claims raised in
> his federal habeas petition.  Or there is a basis for
> excusing any procedural default to avoid the manifest
> injustice of continuing to incarcerate a state prisoner
> who is actually innocent of the crimes for which he was
> convicted.

(<u>Id.</u> at 19).

The success of Petitioner's gateway actual innocence or
miscarriage of justice claim under <u>Schlup</u> rests in large part on
the credibility of Tommy Lynn Sells' confessions, which is also the
issue raised in Ground One of his section 2254 petition, which was
exhausted in his state habeas appeal.  Accordingly, the undersigned

74

will address the merits of that claim and propose a ruling thereon, before further addressing and proposing a ruling on the Schlup issue.

Petitioner's Response asserts that the state habeas courts' findings of fact concerning the credibility of Sells' confessions are "based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." He further asserts that he has rebutted the presumption that the state courts' factual findings are correct with "clear and convincing evidence" and, thus, he is entitled to relief under 28 U.S.C. §§ 2254(e)(1) and (d)(2).  (# 60 at 19-20).  The undersigned disagrees.

The factual findings made by both the circuit court and the SCAWV in Petitioner's state habeas proceedings were entirely reasonable based upon the facts presented.  Furthermore, Petitioner has not presented clear and convincing evidence that would make those findings unreasonable.  As noted above, when reviewing "newly-discovered" evidence to determine whether a new trial should occur, the District Judge must evaluate the credibility of the new evidence and the evidence must be examined in light of the entire record.  See O'Dell v. Netherland, 95 F.3d 1214, 1250 (4th Cir. 1996).

The mistakes made by Tommy Lynn Sells in his confession render it incredible, especially in light of the record as a whole.

Petitioner's repeated argument that the crime scene fit Sells'
*modus operandi* of cleaning up the crime scene is contradicted by
the fact that the bloody gauze and the canteen were found in the
house.  Furthermore, given Petitioner's admission that he stole the
victims' car on the evening of Saturday, September 7, 1991, the
fact that the car was not hot-wired and that the keys were usually
kept on a nail in the kitchen door, the fact that Petitioner was
found to be in possession of personal items known to be inside the
victims' home, and the fact that Petitioner repeatedly changed his
story about how he came into possession of both the victims' car
and their personal property, it is unlikely that a reasonable juror
would have believed that Tommy Lynn Sells met Pamela Castaneda and
came home with her in the white Ford Taurus (that Petitioner had
already stolen) sometime between Saturday night, September 7, 1991,
and Monday, September 9, 1991, when the bodies were found, and that
he stayed in the attic for two to three days, undetected by Ms.
McClain.  Further, it is unlikely that a reasonable juror would
find that, in that two or three day time period, either Sells or
Ms. Castaneda left the house and sold a television set that
belonged to the victims, in order to obtain money to pay for drugs
that Sells had provided to Ms. Castaneda.  Finally, it is unlikely
that a reasonable juror would believe that Sells left the house
with the same CB radio that Petitioner was known to have possessed
on September 7, 1991.

Therefore, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. Thus, Petitioner has not demonstrated that the newly-discovered evidence of Tommy Lynn Sells' confession is such that it ought to produce an opposite result in a second trial on the merits.

Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying habeas corpus relief on Petitioner's newly-discovered evidence claim were neither contrary to, nor an unreasonable application of clearly-established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Therefore, the undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on Ground One of Petitioner's section 2254 petition.

Moreover, the undersigned proposes that the presiding District Judge **FIND** that Petitioner cannot establish actual innocence based upon the evidence presented and, thus, he cannot establish cause and prejudice, or a miscarriage of justice based upon his conviction, sufficient to excuse his procedural default of Grounds Three through Six and Eight through Ten of his section 2254 petition. Accordingly, based upon these findings, the undersigned

77

proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on Grounds Three through Six and Eight through Ten of Petitioner's section 2254 petition.

**D.  Ground Two - Erroneous consideration of Sells' recantation letter.**

As previously noted, in Ground Two of his section 2254 petition, Petitioner alleges that the state habeas courts erroneously considered a letter in which Tommy Lynn Sells' recanted his confessions to the murders of Ms. McClain and Ms. Castaneda. Petitioner's Memorandum of Law in support of his section 2254 petition states in pertinent part:

> In denying a new trial based on the believe [sic; belief] the confessions of Tommy Lynn Sells are false, the Circuit Court of Kanawha County on September 17, 2007, and the West Virginia Supreme Court of Appeals on March 12, 2009, based their respective rulings, in part, on Sells' purported one (1) page hand written recantation.  As the Circuit Court stated in its Order denying habeas relief, "Tommy Lynn Sells has recanted his 'confession' on more than one occasion."  See Circuit Court Order, September 17, 2007, para. 75 and the WVSCA Opinion filed on March 12, 2009, affirming the Circuit Court's decision to deny the Petitioner a new trial.
>
> Now the Petitioner claims Tommy Lynn Sells purported recantation is false and the State offered no evidence whatsoever that Sells recanted his confessions under oath on the record subject to cross-examination by Petitioner's habeas counsel during any stage of the state post-conviction proceedings.  Besides this there is no evidence on the record that Sells recanted on more than one occasion.  In fact, the basis of the Circuit Court's claim regarding more than one occasion is based upon two (2) newspaper reports and the victims' family members making allegations in the media claiming Sells recanted on February 6, 2006 to a Texas newspaper reporter named Karen Gleason for the Del Rio News Herald and on February 7, 2006, in a Charleston Gazette story by Andrew

Clevenger, staff writer.  Allegations in the news media
your Petitioner contends are not admissible, nor
permissible for consideration by the State in this case
to rely upon to assert Sells[] recanted his 'confession'
on more than one occasion to form the basis to deny the
Petitioner a new trial.

Now in considering the purported recantation by
Sells as a basis for its ruling, the Circuit Court of
Kanawha County and the WVSCA violated Petitioner's
guaranteed right to confrontation pursuant to the Sixth
Amendment of the United States Constitution which
guarantees him the right "to be confronted with the
witness against him" as newly discovered evidence in a
state habeas corpus proceeding.  According to the
Petitioner, this legal right is secured to state court
defendants under the Fourteenth Amendment, as is
discussed in Pointer v. Texas, 380 U.S. 400 (1965).

Also in Davis v. Alaska, 425 U.S. 308, 315 (1974),
the Court emphasized that the essential purpose of the
Confrontation Clause "is to secure for the opponent the
opportunity of cross-examination." Thus, it should apply
to this particular case based on the Petitioner's claim
of newly discovered evidence, claim of actual innocence
and the State's allegation that Sells recanted which was
never subject to cross-examination by Petitioner's
counsel in a court of law to prove the purported
recantation is false on its face and his confession is
true.

(# 10 at 55).

Petitioner's claim in Ground Two does not challenge the

admission of an out of court statement by a declarant that was used

at his trial.  Rather, Petitioner challenges the alleged

consideration by the Circuit Court of Kanawha County of Sells'

recantation letter in finding that Sells' prior confession to these

crimes was not credible in his state habeas corpus proceeding.  (#

39, Ex. 13).  Petitioner was unable to cross-examine Sells about

this alleged recantation because Sells refused to give another

79

deposition or cooperate any further with the parties in this matter. His claim is based upon one sentence in the Circuit Court's Order denying habeas corpus relief in which the Circuit Court stated "Tommy Lynn Sells has recanted his 'confession' on more than one occasion." (# 39, Ex. 15, ¶ 75).

Petitioner's only federal constitutional challenge concerns the Confrontation Clause of the Sixth Amendment. Obviously, Petitioner did not raise a challenge under the Confrontation Clause until his habeas appeal, because the challenge is based upon the Circuit Court's alleged reliance, in part, on the recantation, in denying Petitioner habeas corpus relief.

In <u>Crawford v. Washington</u>, 541 U.S. 36, 124 S. Ct. 1354 (2004), the Supreme Court held that out-of-court statements that are "testimonial" are barred, under the Confrontation Clause, unless the witness is unavailable, and the defendant had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by the court. Petitioner contends that <u>Crawford</u> is applicable in this case, and should bar any consideration of Sells' recantation letter. (# 10 at 57). Petitioner further asserts that the consideration of the recantation letter violated the West Virginia Rules of Evidence, which Petitioner asserts resulted in a violation of his due process rights when the state courts denied him a new trial. (<u>Id.</u>) Petitioner's Memorandum in support of his section 2254 petition

80

further states:

> In the present case, the Honorable Jennifer Bailey Walker, Judge presiding, of the Circuit Court of Kanawha County treated Sells' statement as an authentic recantation, without requiring the State to comply with the Confrontation Clause of the Sixth Amendment under the United States Constitution and Rule 901(a) of the West Virginia Rules of Evidence.  In failing to doing so, the Circuit Court's violation of the Petitioner's right to confront the witness who is purported to have recanted and the aforementioned rule along with the improper consideration of Sells' reported recantation is prejudicial error because the Court cited the recantation as one of the reasons for denying a new trial to the Petitioner herein.

(Id. at 60).

Petitioner's challenge concerns evidence that was considered in his state habeas proceedings, not in the trial itself.  Errors occurring in state post-conviction proceedings typically cannot serve as a basis for federal habeas corpus relief.  See Wright v. Angelone, 151 F.3d 151, 159 (4th Cir. 1998) ("[A] challenge to Virginia's state habeas proceedings, cannot provide a basis for federal habeas relief); Bryant v. Maryland, 848 F.2d 492, 493 (4th Cir. 1988); see also Williams-Bey v. Trickey, 894 F.2d 314, 317 (8th Cir.), cert. denied, 495 U.S. 936, 110 S. Ct. 2183, 109 L. Ed.2d 511 (1990)("[A]n infirmity in a state post-conviction proceeding does not raise a constitutional issue cognizable in a federal habeas petition."); Vail v. Procunier, 747 F.2d 277, 278 (5th Cir. 1984)("Infirmities in state habeas corpus proceedings do not constitute grounds for federal habeas relief.").

"Even where there may be some error in state post-conviction proceedings this would not entitle [petitioner] to federal habeas corpus relief since [petitioner]'s claim here represents an attack on a proceeding collateral to the detention of [petitioner] and on the detention itself." <u>Williams v. Missouri</u>, 640 F.2d 140, 144 (8th Cir.), <u>cert. denied</u>, 451 U.S. 990, 101 S. Ct. 2328, 68 L. Ed.2d 849 (1981).  Thus, even if Sells' recantation letter could be considered to be an out-of-court, testimonial statement that is offered for the truth of the matter asserted under <u>Crawford</u>, because it was offered in a state habeas proceeding, any error made in considering the recantation letter cannot form the basis of federal habeas corpus relief.

Moreover, as the SCAWV found, it does not appear that the Circuit Court relied in great part, if at all, on the recantation letter in finding Tommy Lynn Sells' confession to be incredible and insufficient new evidence upon which to grant a new trial.  There were numerous other factors upon which the circuit court made its ruling, and Petitioner's claim amounts to a challenge based upon state evidentiary law.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Ground Two of Petitioner's section 2254 petition does not state a cognizable claim for relief in federal habeas corpus, that the state courts' rulings are neither contrary to, nor an unreasonable application of clearly-established federal

law and are not based upon an unreasonable determination of the facts as presented in the state court proceeding, and that Respondent is entitled to judgment as a matter of law on Ground Two of Petitioner's section 2254 petition.

### **RECOMMENDATION**

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** Respondent's Motion for Summary Judgment (# 39), **DENY** Petitioner's section 2254 petition, and dismiss this civil action from the docket of the court.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, Chief United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder

v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).  Copies of such objections shall be provided to opposing counsel and Chief Judge Goodwin.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy of the same to Plaintiff and to transmit it to counsel of record.

_____
August 24, 2010
Date

_____
Mary E. Stanley
United States Magistrate Judge

84